681 P.2d 1374

**STATE of Arizona, Appellee,**

v.

**Joe U. SMITH, Appellant.**

**No. 6027–PR.**

Supreme Court of Arizona,
In Banc.

April 3, 1984.

Reconsideration Denied May 8, 1984.

356

Robert K. Corbin, Atty. Gen. by William J. Schafer III, and Georgia B. Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

William C. Porter, Kingman, for appellant.

Frederic Dardis, Pima County Public Defender by Lawrence H. Fleischman, Deputy

Public Defender, Tucson, on brief of amicus curiae Pima County Public Defender.

William J. Ekstrom, Jr., Kingman, on brief of amicus curiae Mohave County.

Davis, Siegel & Gugino by Michael L. Piccarreta, Phoenix, on brief of amicus curiae State Bar of Ariz.

Ross P. Lee, Maricopa County Public Defender by Bedford Douglass, Deputy Public Defender, Phoenix, on brief of amicus curiae Maricopa County Public Defender.

Malcolm C. Young, Washington, D.C., on brief of amicus curiae Nat. Legal Aid and Defender Ass'n.

CAMERON, Justice.

The defendant, Joe U. Smith, was convicted and judged guilty of burglary, A.R.S. § 13–1507, sexual assault, A.R.S. § 13–1406, and aggravated assault, A.R.S. §§ 13–1203 and 13–1204. He was sentenced to a term of fifteen years for the burglary to run consecutively with concurrent sentences of three years for the aggravated assault and twenty-one years for the sexual assault. The Court of Appeals affirmed in a memorandum decision. We granted the defendant's petition for review, taking jurisdiction pursuant to Ariz. Const. Art. 6, § 5(3) and Rule 31.19, Arizona Rules of Criminal Procedure, 17 A.R.S. We reverse.

We granted review to consider only two questions decided by the Court of Appeals:[1]

1. Was the testimony of an alibi witness properly excluded?
2. Did the defendant receive adequate assistance of counsel at trial?

Regarding the question of adequacy of counsel, we noted that the allegation of inadequacy resulted from the manner in which attorneys are selected to represent indigent criminal defendants in Mohave County. We ordered expansion of the record to consider the Mohave County system of providing counsel for indigent defendants as it relates to adequacy of defense counsel. We also invited amici briefs and directed attention to the following questions:

a. Is it proper for a county to use a method of selection of counsel for indigent defendants which uses as its criteria for selection the lowest annual fee bid, without considering the attorney's experience, ability, or workload, and without limiting the number of clients for which he is responsible, or the hours of work he must perform under the contract?

b. Can this practice result in an attorney so selected being so overworked that he is unable to competently represent his clients and guarantee their rights under the Fifth and Sixth Amendments to the United States Constitution and Article 2, §§ 4 and 24 of the Arizona Constitution, as well as DR 6–101, 7–101 of the Rules of the Arizona Supreme Court, or other appropriate ethical considerations?

c. Can this practice cause a difference in the quality of representation afforded those accused of crime, depending upon the county in which they are charged, comparing other methods of providing attorneys' services in other counties in Arizona? Can this cause an equal protection problem under the Fourteenth Amendment to the United States Constitution?

d. Under the facts of this case were any of defendant's constitutional rights violated by Mohave County's contract method of providing counsel for indigent defendants?

The facts necessary to determine these issues follow. The victim was at home in Kingman, Arizona, with her six-year-old daughter on the evening of 17 December 1980. At approximately 10:30 she answer-

---

**1.** Another issue, the correctness of the court's flight instruction, was also raised. Because we find no error in that instruction or the Court of Appeals' treatment of that issue, we do not consider it here.

ed a knock at her door. A man the victim later identified as the defendant asked if her husband was home and when he would return. The victim replied she did not know. He then burst through the door, grabbed the victim by the neck, and threatened to kill her if she screamed. The victim was forced into her living room and raped while the assailant maintained his grip on her neck. She passed out temporarily. When she came to, the assailant spoke with the victim for about fifteen minutes and then again had intercourse and performed cunnilingus on the victim. He spoke with the victim for a few more minutes and finally left. She watched him go over to a trailer across the street.

The victim reported the crime to her parents, who then contacted the police. She described her assailant as having dark hair and a full-face beard. She claimed she did not recognize him as anyone she knew until she saw him go over to the trailer across the street, at which time she realized she had seen him at the trailer working on a motorcycle in the days prior to the assault. The victim was shown a picture of a man with a beard (not the defendant) and did not recognize him. After the police investigation began to center on the defendant, the victim was shown six photographs of men with dark hair and full-face beards, including the defendant, and she identified the defendant as her assailant.

On 24 December an officer visited the trailer across the street from the victim's home to serve an arrest warrant on the defendant. The defendant was not there, but the officer spoke to the defendant's brother Tim, who also had a full-face beard and who lived in the trailer and owned a motorcycle he kept at the trailer. Tim later told the defendant about the visit.

The defendant was arrested in Reno in September, 1981. His defense was one of mistaken identification and alibi. In support of this defense, the defendant pointed out that the six-photo line-up from which the victim identified the defendant did not include a picture of the defendant's brother Tim, who resembled the defendant. The

defendant's sister testified that the defendant was in Parker, Arizona, visiting her from the beginning of December, 1980, until February, 1981, and that he shaved his beard shortly after arriving in Parker. She stated that the defendant said he thought the police were looking for him because of some traffic tickets he had received. The jury found the defendant guilty, and he appeals.

## PRECLUSION OF THE WITNESS MARTIN

The defendant contends that he was staying with his sister in Parker at the time of the attack and that he shaved his beard shortly after arriving in Parker at the beginning of December. The defendant's sister corroborated his alibi. She also testified that her boyfriend, Red Martin, knew the defendant was in Parker at the time. Martin's whereabouts were not known to defendant's counsel prior to trial, although counsel had made attempts to locate him. In fact, Martin was living with defendant's sister in Kingman at the time. On the second day of trial and after the state had rested its case, the defense attorney learned that Martin was in the courtroom. He moved to permit Martin to testify, but the trial court denied the motion because Martin was not disclosed as a potential witness in the case. The defendant claims this was error. He contends the court should have imposed a less severe sanction for failure to disclose Martin, such as granting the state a continuance.

The state argues that Martin's testimony only would have been cumulative, and that the prosecutor would not have had time to prepare rebuttal, even with a continuance. The state further contends there was a lack of good faith, because this was not the only occasion of defense counsel's failure to disclose, and also that the defendant has failed to show any prejudice. Therefore, the state claims the trial court did not abuse its discretion in precluding Martin's testimony. We do not agree.

■ With regard to preclusion of a witness, this court has stated:

Pursuant to 17 A.R.S., Rules of Criminal Procedure, rule 15.7, the trial court is authorized to impose sanctions upon a party who fails to comply with any of the provisions of rule 15. One such sanction is the preclusion of an undisclosed witness' testimony. In general, the appropriate sanction for noncompliance with rule 15 is left to the sound discretion of the trial court.

The trial court, however, should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible, since the rules of Criminal Procedure are designed to implement, and not to impede, the fair and speedy determination of cases. Prohibiting the calling of a witness should be invoked only in those cases where other less stringent sanctions are not applicable to effect the ends of justice. To be effective, discovery rules must be applied with equal force to both parties.

We, therefore, hold that prior to precluding either party's witnesses, as a discovery sanction, the court must make an inquiry into the surrounding circumstances. Failure of the trial court to do so constitutes error. The inquiry should determine if less stringent sanctions can be used. The court should also consider how vital the precluded witness is to the proponent's case, whether the opposing party will be surprised and prejudiced by the witness' testimony, whether the discovery violation was motivated by bad faith or wilfulness, and any other relevant circumstances.

*State v. (Joseph Clarence, Jr.) Smith,* 123 Ariz. 243, 252, 599 P.2d 199, 208 (1979) (footnotes and citations omitted). *Smith,* supra, sets forth four criteria for determining whether the sanction of preclusion should be imposed: (1) how vital the witness is to the case, (2) whether the opposing party will be surprised, (3) whether the discovery violation was motivated by bad faith, and (4) any other relevant circumstances.

■ In the instant case, Martin's testimony is vital to the defendant. If Martin did indeed testify that the defendant was in Parker at the time of the assault and that the defendant shaved his beard shortly after arriving in Parker, it would add considerable weight to the defendant's argument that the victim made a mistake in identification. Martin's testimony could be more persuasive than defendant's sister's because Martin is not related to the defendant. While the state may legitimately claim surprise, the state had interviewed the defendant's sister and was aware of Martin's existence before trial as well as the alibi defense. In the instant case, nondisclosure does not appear to have been due to bad faith or wilfulness, but rather because the defendant's attorney honestly believed Martin was not available and could not be located. In this case other, less stringent sanctions, such as granting a continuance, were available to effect the ends of justice, and we believe it was error to not allow Martin to testify. We therefore reverse the convictions and remand the case for a new trial.

## EFFECTIVE ASSISTANCE OF COUNSEL

■ The defendant claims he was denied effective assistance of counsel at trial. The standard for judging effective assistance of counsel is "whether under the circumstances the attorney showed at least minimal competence in representing the criminal defendant." *State v. Watson,* 134 Ariz. 1, 4, 653 P.2d 351, 354 (1982). The focus is on the quality of performance, not on the effect of that performance on the outcome of the proceeding, and disagreements in trial strategy or tactics will not support an ineffectiveness claim as long as the challenged conduct could have some reasoned basis. *Id.* Applying this test, we are satisfied with the treatment of this issue by the Court of Appeals.

We granted review, however, particularly to consider defendant's allegation that the defendant's attorney spent only two to three hours interviewing the defendant and "possibly" six to eight hours studying the case because of the attorney's "shocking,

staggering and unworkable" caseload. The caseload was allegedly a product of the Mohave County system for providing defense counsel for indigents.

In order to determine whether that system is a relevant factor in determining whether there was adequate assistance of counsel, we ordered the record expanded in this case to consider the questions set forth above.

### a. Whether the Mohave County Bid System is Adequate

As noted in defendant's brief, the procedure followed in Mohave County is basically as follows. In May of each year a bid letter goes out from the presiding judge of Mohave County to all attorneys in the county. It calls for sealed bids to be opened at a given hour and date. No limitation is suggested on caseload or hours, nor is there any criteria for evaluating ability or experience of potential applicants. The successful bidders are assigned all indigent criminal cases in the superior courts, justice of the peace courts, juvenile courts, all appeals in Mohave County, and all mental evaluations.

It is stated in the bid letter that additional compensation might be paid for unusually difficult or time-consuming cases, but the letters also advise over the past fourteen years there has never been such a case. No suggestion is made that counsel may expect assistance in any way for support personnel. Any investigator, paralegal, secretary, or similar personnel must be provided by the individual bidder who must also provide his own office space, equipment, and supplies. "Unusual" xerox charges, long distance phone charges, and mileage are reimbursable, according to the letters.

The bids are opened and transmitted promptly by the presiding judge to the Mohave County Board of Supervisors with a cover letter summarizing the dollar sums bid. No recommendation is made by the judge, nor is the Board provided with any information concerning the background, experience or capabilities of any bidding attorney. The judge lists the bids by lowest amount and by percent of the caseload the bidding attorney proposes to accept, such as "if divided into four contracts," "if divided three ways," and so on.

The Board of Supervisors then accepts the bids it desires. With only one exception in the past four years, the Board has accepted the lowest bids fitting into that particular division. The only low bid ever rejected was one submitted by an attorney who has been held in contempt by this court for failing to file a required brief in an appeal and who has been the subject of other repeated complaints.

Several aspects of this system should be noted. First, there is no way to know the complexity of the cases that are assigned. Murders, rapes, robberies, and aggravated assaults are mixed with less serious crimes. Second, counsel are also expected to handle appeals, juvenile law, and mental health commitments. They must represent clients in the justice of the peace courts ranging from the southern end of Mohave County to Littlefield on the Arizona Strip. Third, these are part-time counsel who also handle a civil practice. In the instant case defendant's attorney handled all the indigent criminal defendants of the City of Kingman. In 1982–83, the four low bids were $24,000, $26,200, $34,300, and $34,400. Each attorney was expected to handle one-fourth of the total caseload of Mohave County, regardless of the number of cases.

The amicus brief submitted by the Pima County Public Defender's Office cites a tentative draft produced for the National Legal Aid and Defender Association [NLADA] entitled "Guidelines for Negotiating and Awarding Indigent Defense Contracts" [hereinafter Negotiating Guidelines]. That draft discusses the factors to be considered in providing and funding indigent defense contracts. Among these factors are:

(1) The customary compensation in the community for similar services rendered by privately retained counsel to a non-indigent client or by government or other publicly-paid attorneys to a public client;

(2) the time and labor required to be spent by the attorney; and

(3) the degree of professional ability, skill, and experience called for *and* exercised in the performance of the services.

NLADA Guidelines for Negotiating and Awarding Indigent Defense Contracts, Guideline III–9(b) (tentative draft, 1983) (emphasis in original). In addition to these guidelines, the American Bar Association Standards for Criminal Justice state in pertinent part:

Standard 4–3.3. Fees

(a) In determining the amount of the fee in a criminal case, it is proper to consider the time and effort required, the responsibility assumed by counsel, the novelty and difficulty of the questions involved, the skill requisite to proper representation, the likelihood that other employment will be precluded, the fee customarily charged in the locality for similar services, the gravity of the charge, the experience, reputation, and ability of the lawyer, and the capacity of the client to pay the fee.

I ABA Standards for Criminal Justice, Standard 4–3.3 (2d ed. 1980). In addition, both the NLADA and the American Bar Association Standards require adequate investigative and support services for the defendant's lawyer.

The Negotiating Guidelines further provide:

Allowable Caseloads. The contract should specify a maximum allowable caseload for each full-time attorney, or equivalent, who handles cases through the contract. Caseloads should allow each lawyer to give every client the time and effort necessary to provide effective representation.

Under no circumstances should maximum allowable caseloads for each full-time attorney exceed the following:

(a) 150 felonies per attorney per year; or

(b) 300 misdemeanors per attorney per year; or

(c) 200 juvenile cases per attorney per year; or

(d) 200 mental commitment cases per attorney per year; or

(e) 25 appeals to appellate court hearing a case on the record and briefs per attorney per year.

Attorneys employed less than full-time or handling a mix of cases should handle a proportional caseload.

NLADA Guidelines for Negotiating and Awarding Indigent Defense Contracts, Guideline III–6 (tentative draft, 1984). These amounts are in the disjunctive, not the conjunctive, and mean that to properly represent the clients assigned an attorney should not represent more than 150 felonies a year *or* more than 300 misdemeanors *or* 200 juvenile cases per year, etc. Of course, these recommendations are the "maximum allowable" and do not take into account differences in practice in a particular jurisdiction, such as the percentage of cases that are plea bargained and the number that actually go to trial. Both the amount of time spent investigating a matter to determine what is a fair plea bargain and the time in preparing for trial can vary greatly from case to case.

The defendant's counsel in the instant case for eleven months of the year in which the defendant was tried handled a caseload of:

149 felonies

160 misdemeanors

21 juvenile cases, and

33 other types of cases.

This was for part-time representation only. The attorney in the instant case also handled all of the Kingman city appointment cases, as well as a private civil practice. While testifying at the hearing on the motion for a new trial counsel stated that the Kingman caseload consisted of five trials per month through November and twenty-five trials in December. It is obvious that the caseload of defendant's attorney was excessive, if not crushing. In making this determination we do not base our opinion on the standards alone, but also on our own experience as attorneys and upon the re-

quests for compensation by attorneys appearing before this court who represent indigent defendants. We reach this conclusion even though the record in this particular case does not indicate that the defendant was inadequately represented. The fact that one felony defendant out of 149 felony defendants was given minimum adequate representation does not mean that others were properly represented. The insidiousness of overburdening defense counsel is that it can result in concealing from the courts, and particularly the appellate courts, the nature and extent of damage that is done to defendants by their attorneys' excessive caseloads.

We do not believe the Mohave County system is in conformance with these standards and guidelines for four reasons:

1. The system does not take into account the time that the attorney is expected to spend in representing his share of indigent defendants.

2. The system does not provide for support costs for the attorney, such as investigators, paralegals, and law clerks.

3. The system fails to take into account the competency of the attorney. An attorney, especially one newly-admitted to the bar, for example, could bid low in order to obtain a contract, but would not be able to adequately represent all of the clients assigned according to the standard of *Watson*, supra.

4. The system does not take into account the complexity of each case.

■ We believe that the system for obtaining indigent defense counsel in Mohave County militates against adequate assistance of counsel for indigent defendants. Even though in the instant case we do not find inadequate representation, so long as the County of Mohave fails to take into account the items listed above, there will be an inference that the adequacy of representation is adversely affected by the system.

b. Does the System Violate the Constitutional Rights of Defendants in Mohave County

■ The question is whether the system so overworks the attorneys that it violates the Fifth and Sixth Amendments to the United States Constitution and Article 2, §§ 4 and 24 of the Arizona Constitution, as well as the Arizona Rules of Professional Responsibility, DR 6–101 and 7–101, Rules of the Supreme Court, 17A A.R.S. The Fifth Amendment of the United States Constitution provides that no criminal defendant shall be deprived of "due process of law," and the Sixth Amendment guarantees the "assistance of counsel for [the defendant's] defense." Section 4 of Article 2 of the Arizona Constitution provides for due process and § 24 sets forth the rights of criminal defendants, including the right to counsel.

We believe the procedure followed by Mohave County violates the right of a defendant to due process and right to counsel as guaranteed by the Arizona and United States Constitutions. We reach this conclusion based upon the reasoning stated above, that an attorney so overburdened cannot adequately represent all his clients properly and be reasonably effective. Some defendants must receive inadequate representation in relation to those who do, in fact, receive adequate representation. In reaching this conclusion we note that we must fault not only the system used in Mohave County but the attorneys involved as well. It can be expected and understood that a government agency will (and in most cases should) try to obtain services at the lowest possible cost to the taxpayers. This is acceptable as long as the services obtained are adequate for the specific purpose to be served. We recognize also that the Board of Supervisors is not always able to determine whether adequate services are being provided by counsel. The attorneys involved, however, are in a position to know when a contract will result in inadequate representation of counsel.

The Arizona Rules of Professional Responsibility, DR 6–101 and 7–101, Rules of the Supreme Court, 17A A.R.S., provide that attorneys should not seek or accept employment that cannot be adequately per-

formed. The ABA Standards also discuss an indigent defense attorney's caseload. The pertinent standards state:

Standard 4–1.2. Delays; punctuality

\*　　\*　　\*　　\*　　\*　　\*

(d) A lawyer should not accept more employment than the lawyer can discharge within the spirit of the constitutional mandate for speedy trial and the limits of the lawyer's capacity to give each client effective representation. It is unprofessional conduct to accept employment for the purpose of delaying trial.

\*　　\*　　\*　　\*　　\*　　\*

Standard 5–4.3. Workload

Neither defender organizations nor assigned counsel should accept workloads that, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations. Whenever defender organizations or assigned counsel determine, in the exercise of their best professional judgment, that the acceptance of additional cases or continued representation in previously accepted cases will lead to the furnishing of representation lacking in quality or to the breach of professional obligations, the defender organizations or assigned counsel must take such steps as may be appropriate to reduce their pending or projected workloads.

I ABA Standards for Criminal Justice, Standards 4–1.2 and 5–4.3 (2d ed. 1980).

█ Under the Mohave County system, a contract attorney is paid the bid amount no matter how many or what type of cases are handled, how much time and expertise is required, or how experienced the attorney is. There is no limit to the number of cases any one attorney may be assigned (though it is presumed the caseload will be split four ways). Should an attorney need assistance from an investigator or should a case on a contract attorney's docket need to be assigned to a non-contract attorney, the fees for the investigator or outside attorney are paid by the contracting attorney, thereby reducing the likelihood an attorney will seek outside help when needed. No limit is placed on an attorney seeking other, paying clients. Therefore, an attorney may be forced to allot his limited amount of time and resources between paying clients and indigent clients or even between different indigent clients. This can result in a breach of the attorney's professional responsibility under DR 5–101, 6–101, 7–101, or 5–105. We remind counsel that accepting more cases than can be properly handled may result not only in reversals for failing to adequately represent clients, but in disciplinary action for violation of the Code of Professional Responsibility. *See* DR 1–102(A)(6), Rules of the Supreme Court, 17A A.R.S.

c. Possible Equal Protection Violations

In comparing the different systems (as indicated in the briefs) of indigent representation used in the State of Arizona, we find that in Apache County the Board of Supervisors has appointed attorneys to handle indigent defense and compensation has been based on a flat monthly fee. Conflict cases and appeals are apparently handled by appointing other counsel, who are compensated on an hourly basis. Navajo, Gila, Graham and Greenlee Counties apparently use a similar system, but Graham and Greenlee Counties specifically provide that outside counsel will be compensated by the contract attorney. Except possibly in Graham County, the system in those counties does not appear to involve a competitive bidding situation. The Superior Court in each county apparently takes part in selection of counsel and setting compensation.

Pima and Maricopa Counties each have a public defender's office. In both counties, there is a judicially supervised method of allotting and funding an excessive number of cases.

Coconino County has had the same law firm handling its indigent defense work for several years. It appears that the firm and the county negotiate a compensation agreement. The firm is given a chance to increase its size and compensation through

this negotiation, and thereby allow for an increased caseload.

Cochise, Santa Cruz, Yavapai and Yuma Counties all use some form of a rotation system with compensation either set by the court or provided on an hourly basis. La-Paz County has had one attorney handling indigent work. Again the court sets the compensation. There was nothing in the record indicating what system was used by Pinal County.

Comparing these different systems, we believe that the Mohave County system is the least desirable and can result in inadequate representation by counsel. This, however, does not justify a finding of lack of equal protection. Indeed, if we could find that the least effective system was for that reason alone a denial of equal protection, there would be no end to county-by-county challenges alleging that each county system was, in turn, the least effective. It is enough that the system in Mohave County results in a denial of due process and inadequate representation of counsel. As long as there is adequate representation for each defendant it is immaterial whether the system in one county is better or worse than the system in another, and we know of no case in which the variance in quality of representation from county to county within a state has been held to constitute a violation of equal protection of law. The United States Supreme Court has stated:

> [W]e have held that the Equal Protection Clause relates to equality between persons as such, rather than between areas and that territorial uniformity is not a constitutional prerequisite.

*McGowan v. State of Maryland*, 366 U.S. 420, 427, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393, 400 (1961). That court has also stated:

> Indeed, showing that different persons are treated differently is not enough, without more, to show a denial of equal protection.

*Griffin v. County Sch. Bd. of Prince Edward Co.*, 377 U.S. 218, 230, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256, 264–65 (1964).

The Louisiana Supreme Court in cases interpreting their constitution which re-

quires a "uniform system for securing and compensating qualified counsel for indigents," Louisiana Constitution of 1974, Art. 1, § 13, has held that the methods of providing counsel for indigent defendants may vary from one part of the state to another and does not violate equal protection where it is necessary

> to balance the needs for uniformity against the need for workability in a State with political subdivisions of widely varying population, geography, customs and problems.

*State v. Bryant*, 324 So.2d 389, 393 (La. 1975). *See also State v. Turner*, 337 So.2d 1090, 1095 (La.1976).

■ Admittedly, the United States Supreme Court has held that a proportionality review of sentences in other jurisdictions for the same or similar crimes or for different but similar offenses in the same jurisdiction is relevant for purposes of determining whether a person has been subjected to cruel and unusual punishment prohibited by the Eighth Amendment. *See Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The United States Supreme Court has not held, however, that differences in sentences from state to state, or differences in sentences within a state, violate the Equal Protection Clause. *See McGlothen v. Dept. of Motor Vehicles*, 71 Cal.App.3d 1005, 1021, 140 Cal.Rptr. 168, 178–79 (1977). We find no equal protection violation.

d. Whether the Defendant's Right Was Violated

■ We must finally consider whether the record and facts in this case indicate that the defendant's right to effective assistance of counsel was violated by the method of selecting counsel followed in Mohave County. As noted above, we have not found that defendant was inadequately represented at trial. Even though we believe that the system used raises an inference of inadequate representation of counsel, that inference has been rebutted by the record in this case.

Because this decision mandates new procedures not heretofore contemplated, we order that this opinion shall be prospectively applied after the mandate issues in this matter. In matters tried prior to the issuance of the mandate, the defendant will still be required to show that he was, in fact, denied adequate assistance of counsel. As to trials commenced after the issuance of the mandate, if the same procedure for selection and compensation of counsel is followed as was followed in this case, there will be an inference that the procedure resulted in ineffective assistance of counsel, which inference the state will have the burden of rebutting.

That portion of the Court of Appeals decision and opinion affirming the conviction despite the allegation that it was error to refuse to allow the alibi witness Red Martin to testify is vacated. The conviction and judgment are reversed and the case remanded to the Superior Court for a new trial.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.