**William R. KENNEDY, Chief Public Defender, Fourth Judicial District, Respondent,**

v.

**Arne CARLSON, Governor, Michael A. McGrath, Treasurer, John Gunyou, Commissioner of Finance, petitioners, Appellants (C0–95–1282), Respondents (C6–95–1559),**

**The Commissioners of Hennepin County, Defendant,**

**The Board of Public Defense, petitioner, Respondent (C0–95–1282), Appellant (C6–95–1559).**

Nos. C0–95–1282, C6–95–1559.

Supreme Court of Minnesota.

Feb. 16, 1996.

Hubert H. Humphrey, III, Atty. Gen., Michael Vanselow, Lisa Tiegel, Asst. Attys. Gen., St. Paul, for appellant.

William R. Kennedy, Chief Public Defender, David Murrin, Asst. Public Defender, Minneapolis, for respondent.

## OPINION

KEITH, Chief Justice.

In April 1992, respondent William R. Kennedy, Chief Public Defender for the Fourth Judicial District, initiated this declaratory judgment action in Hennepin County District Court against appellants, Governor Arne Carlson, Treasurer Michael A. McGrath, Commissioner of Finance John Gunyou (since replaced by Laura King), the State Board of Public Defense and the Commissioners of Hennepin County.[1] Kennedy alleges that Minn.Stat. § 611.27 (1994), which establishes the funding system for Minnesota's public defenders, violates the constitutional rights of indigent criminal defendants to the effective assistance of counsel by not providing sufficient funds for the operation of the Fourth Judicial District Public Defender's Office. Kennedy argues that section 611.27, as applied to his office, is "an unconstitutional abdication of the State of Minnesota's constitutional mandate to provide an effective funding mechanism for delivering effective assistance of counsel, and due process of law to indigent persons." The district court found the statute unconstitutional, and this court granted appellants' petition for accelerated review.

At the outset, we must emphasize the crucial role played by public defenders in this state's judicial system. Since 1963, the right to counsel under the Sixth Amendment has been recognized as a necessary component of each individual's fundamental right to life and liberty. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *In re Gault*, 387 U.S. 1, 36, 87 S.Ct. 1428, 1448, 18 L.Ed.2d 527 (1967) (extending right to counsel to juvenile defendants). Minnesota's judiciary has long recognized the importance of criminal defense counsel, and we are concerned that adequate funds be available for public defense services to indigent juveniles and adults. Under the current system, pub-

lic defenders must rely almost entirely upon state funding for their budgets. This fact, combined with increasing numbers of juvenile and serious crimes, the revised juvenile criminal code, increased statutory penalties, a fluctuating economic climate and other individual pressures on state budgets, has dramatically increased the type and severity of cases handled by public defenders, and prevents Kennedy's office from providing an "ideal" level of public defense services. Nonetheless, we are constrained by Minnesota's caselaw and the facts before us in this case. Because Kennedy has failed to show an "injury in fact" to support his claim as required under Minnesota law, we must reject his request for judicial intervention. We therefore reverse the district court's decision.

### I.

The material facts of this case are uncontested. Until the late 1980s, the funding of public defender services in Minnesota was primarily a county responsibility. Each of the ten judicial districts in the state was responsible for administering this constitutionally mandated service, and financial resources were provided from property tax revenues. Minn.Stat. §§ 611.26, 611.27 (1965). In 1981, the State Board of Public Defense (Board) was created by the legislature to oversee the public defense system and to distribute any funds appropriated by the state for public defense services. *See* Minn.Stat. § 611.215 (1994). In 1989, the legislature temporarily transferred the primary financial responsibility for public defense from the counties to the state. Act of June 3, 1989, ch. 335, art. 1, § 7, 1989 Minn. Laws 2691, 2699–2700. The state's financial responsibility has been extended through July 1, 1997. Minn.Stat. § 611.27, subd. 4 (1995).

The Board is required by statute to recommend to the legislature a budget for statewide public defense services, and then distribute the funds to all public defender offices. Minn.Stat. § 611.215, subd. 2 (1994).

1. Hennepin County and Kennedy reached a settlement in November 1993 in which Hennepin County agreed to supplement the state funds provided for the Fourth District Public Defend- er's Office in exchange for dismissal from Kennedy's lawsuit. Thus Hennepin County is no longer a party to this action.

In fiscal years 1992 and 1993, Kennedy's office received roughly 50% of all district funding for public defense in Minnesota, including county contributions. The legislature appropriated $21,943,000 to the Board for state public defense services in fiscal year 1994, and the same amount for FY 1995. In 1994, Kennedy's office received approximately $8,200,000 of the total district-level appropriations, plus roughly $2,700,000 in supplemental funding from Hennepin County pursuant to Minn.Stat. § 611.27, subd. 5 (1994). The legislature has significantly increased its annual appropriations to the Board for FY 1996-97. The Board will receive $37,593,000 in 1996 and $38,731,000 in 1997. Of these amounts, $33,836,000 and $35,009,000, respectively, are earmarked for district public defense programs. Act of May 25, 1995, ch. 226, art. 1, § 10, 1995 Minn.Laws 1753, 1765. Under the statutory scheme now in effect, the state's contribution to public defense services in Minnesota is expressly limited to the appropriations made to the Board. Minn.Stat. § 611.27, subd. 7 (1994).[2] In addition, the Board is not permitted to fund any particular items or services which were not included within the original district public defender budgets as of January 1, 1990. Minn.Stat. § 611.27, subd. 5 (1994).

As part of the state takeover, the legislature commissioned the Spangenberg Group, Inc., a nationally recognized expert on public defense systems, to perform a "weighted caseload analysis" of public defender caseloads in Minnesota. The Spangenberg Group recommended in a 1991 report that full-time public defenders be assigned no more than three homicide cases per year, *or* 100-120 other felonies, *or* 250-300 gross misdemeanors, *or* 400 misdemeanors, *or* 80 child welfare cases, *or* 175 juvenile matters, *or* 200 "other cases." The Board reviewed the Spangenberg report and adopted its own

caseload standards, with the support of the judicial district's chief public defenders, as a "goal" to achieve by October 1995. The Board rejected the Spangenberg Group's homicide standard, and established that full-time public defenders should take no more than 100-150 felonies per year. Otherwise, the aspirational standards adopted by the Board are identical to the Spangenberg Group's recommendation. These caseload figures assume that roughly 5% of all cases go to trial, while 15% have some form of contested hearing. The actual trial rates for criminal cases in Hennepin County, however, are much lower than the Spangenberg Group's estimate: in 1991, only 2.6% of all felony cases and less than 1% of all misdemeanors were tried.

Before the district court, Kennedy's primary argument was that the current system of state-funded public defender services is inadequate to provide effective assistance of counsel to indigent criminal defendants in the Fourth Judicial District. Specifically, Kennedy criticized the limitation on state funding created by section 611.27, subd. 7, the failure of the Board to obtain sufficient funds for the Fourth District, and the Board's failure to enforce its adopted caseload standards for public defenders. As a result of the lack of adequate funding, Kennedy alleged, his attorneys are "significantly underfunded, understaffed, and therefore unable to adequately and completely fulfill the scope of their representation to their clients as defined by law." Kennedy asserted that the actual caseloads carried by his attorneys far exceeded the standards recommended by the 1991 Spangenberg study, and that this overburdening of his office impaired the rights of his indigent clients and threatened to cause systemic professional misconduct.[3] Kennedy therefore requested that the district court declare section 611.27 unconstitutional, and

---

2. Minnesota Statutes section 611.27, subdivision 7 states:

> *Public defender services; responsibility.* Notwithstanding subdivision 4, the state's obligation for the costs of the public defender services is limited to the appropriations made to the board of public defense. Services and expenses in cases where adequate representation cannot be provided by the district public defender shall be

the responsibility of the state board of public defense.

3. In 1991, for example, the Fourth District Public Defender's Office was assigned a total of 27,000 cases. Of this figure, approximately 3,800 were felonies, and the rest were gross misdemeanors, misdemeanors and juvenile cases.

order the enforcement of the Board's caseload standards and the provision of sufficient funds to enable the Fourth District to provide a constitutional level of legal assistance.

Appellants admit that the Fourth Judicial District Public Defender's Office operates in excess of the aspirational caseload standards, but assert that this fact does not support a claim for which relief can be granted. Appellants state that the Fourth Judicial District has the best compensated, equipped and funded public defender's office in the state. Kennedy himself is the highest paid public defender in Minnesota, and 15 of his full-time attorneys earn over $80,000 per year. In 1994, Kennedy's staff consisted of 67 full-time attorneys, 22 part-time attorneys, 12 investigators, 8 dispositional advisors, 1 paralegal, 8 law clerks and 20 administrative staff members. Thus, the Fourth District has more investigators, law clerks and other non-attorney support staff than all of the other nine judicial districts combined.

Appellants moved for dismissal of Kennedy's complaint, arguing that Kennedy had failed to state a valid claim for relief. The district court denied appellants' motion on November 5, 1992, concluding that the complaint stated a claim for relief, *i.e.*, a request that the court rule on the validity of section 611.27 and compel the state to provide adequate funds. Approximately two years after appellants' motion to dismiss was denied, Kennedy brought a motion for summary judgment pursuant to Minn.R.Civ.P. 56.01, and appellants filed a cross-motion requesting dismissal. On April 24, 1995, the court granted summary judgment for Kennedy.

The district court held that Minn.Stat. § 611.27, subd. 7 is unconstitutional because it infringes upon Kennedy's constitutional duty to provide criminal defense services to the poor by establishing an arbitrary and inflexible cap on state spending for such services. Although the court considered section 611.27 to be "constitutionally innocuous" on its face, it decided that the actual level of funding provided by the state to the public defender system did not adequately safeguard the constitutional rights of the indigent. The court acknowledged that it could not determine whether Kennedy's attorneys

had provided ineffective assistance of counsel in any particular cases, but nevertheless found that judicial relief was necessary to prevent this from occurring in the future. The court noted the Spangenberg Group's findings that public defenders in Minnesota carry an excessive caseload and do not have enough time to devote to their clients. In order to meet the maximum caseloads recommended by the Spangenberg study, the court observed, Kennedy claimed that he would have to increase his current staff by 50% or more. Because the state had refused to supplement current funding for the Fourth District Public Defender and maintained no legislative reserve fund for sudden caseload increases, the court determined that the legislature had ignored its responsibilities. The court therefore held that the arbitrary cap on public defense funding found in section 611.27 was unconstitutional.

Appellants Carlson, McGrath and Gunyou contest the district court's decision, arguing that Kennedy raised no justiciable claim of a constitutional violation because Kennedy failed to prove actual or imminent harm to his office or his clients. The Board also appeals from the district court's decision, arguing that Kennedy did not show that the rights of his clients were violated or about to be violated due to ineffective assistance of counsel. The Board further criticizes the district court's attempt to fashion a judicial remedy to the problem of funding criminal defense services, arguing that neither the lower court nor this court has sufficient evidence to support such an attempt.

## II.

■ Appellants argue on appeal that the district court should not have ruled on the constitutionality of section 611.27 because Kennedy has not raised a justiciable claim. According to appellants, Kennedy contends that Minnesota's statutory scheme for funding public defense services is unconstitutional because it "potentially" deprives indigent defendants of their constitutional right to the effective assistance of counsel. This claim, insist appellants, does not present a justiciable controversy because there has been no showing of actual or imminent harm to Ken-

nedy or his indigent clients. While appellants may agree that public defenders in Minnesota need more money from the legislature, they argue that Kennedy's complaints cannot be judicially reviewed.

■ A justiciable controversy must exist before Minnesota courts have jurisdiction to issue a declaratory judgment regarding the constitutionality of a statute. *St. Paul Area Chamber of Commerce v. Marzitelli,* 258 N.W.2d 585, 587 (Minn.1977). To establish a justiciable controversy, Kennedy must show "a direct and imminent injury which results from the alleged unconstitutional provision." *State v. Colsch,* 284 N.W.2d 839, 841 (Minn. 1979). This court has long held that merely possible or hypothetical injury is not enough to satisfy this standard. *Id.* at 841–42. As we stated in *State ex rel. Smith v. Haveland:*

> Among the essentials necessary to the raising of a justiciable controversy is the existence of a genuine conflict in the tangible interests of the opposing litigants. Complainant must prove his possession of a legal interest or right which is capable of and in need of protection from the claims, demands, or objections emanating from a source competent legally to place such legal interest or right in jeopardy. Although complainant need not necessarily possess a cause of action (as that term is ordinarily used) as a basis for obtaining declaratory relief, nevertheless he must, as a minimum requirement, possess a bona fide legal interest which has been, or with respect to the ripening seeds of a controversy is about to be, affected in a prejudicial manner.

223 Minn. 89, 92, 25 N.W.2d 474, 477 (1946). *Accord Lee v. Delmont,* 228 Minn. 101, 110–11, 36 N.W.2d 530, 537 (1949) (A litigant challenging the constitutionality of statute must show that the statute "is, or is about to be, applied to his disadvantage.").

■ In this case, Kennedy claims that his clients have been exposed to the possibility of substandard legal representation due to excessive public defender caseloads. Kennedy asserts that public defenders in the Fourth Judicial District are overworked and understaffed, and are expected to handle caseloads far in excess of the Board's aspirational standards. Public defenders cannot refuse to accept new clients under Minnesota law;[4] therefore, Kennedy's attorneys must "plead out" two to four cases each day, making it impossible to spend sufficient time with each individual client. As a result of his office's heavy workload, Kennedy argues that his clients' Sixth Amendment right to effective legal assistance may or will be violated, thus creating the "actual injury" required to raise a justiciable controversy.[5]

Appellants and the Board respond that the large number of cases assigned to Kennedy's staff does not amount to an "injury in fact" under Minnesota law. They argue that Kennedy has failed to show that his clients are actually receiving ineffective assistance of counsel or that their Sixth Amendment rights have been violated in any identifiable way. We note that appellants cite a number of decisions by other courts addressing the issue of public defense funding. In those cases where courts have found a constitutional violation due to systemic underfunding, the plaintiffs showed substantial evidence of serious problems throughout the indigent de-

---

4. *See Dziubak v. Mott,* 503 N.W.2d 771, 775 (Minn.1993) ("[A] public defender may not reject a client, but is obligated to represent whomever is assigned to her or him, regardless of her or his current caseload or the degree of difficulty the case presents.").

5. Kennedy does cite two other potential "injuries" in his complaint, namely that he is exposed to professional and civil liability as a result of these excessive caseloads. Public defenders, however, are immune from suits alleging legal malpractice in Minnesota. *Dziubak,* 503 N.W.2d at 773. Therefore, Kennedy cannot assert that he faces actual or imminent harm on this ground. Furthermore, Rule 8(b) of the Rules on Lawyers Professional Responsibility requires the Director of the Office of Lawyers Professional Responsibility to dismiss all complaints by criminal defendants against their court appointed counsel without prejudice. The Director cannot independently investigate claims of incompetent representation brought by indigent criminal defendants against their appointed defenders. Defendants can only raise such claims before the district court involved in their case, and that judge can refer the matter to the Director for investigation. This fact undermines Kennedy's claim that he is threatened with professional harm as a result of Minn.Stat. § 611.27.

fense system. By comparison, Kennedy has shown no evidence that his clients actually have been prejudiced due to ineffective assistance of counsel. To the contrary, the evidence establishes that Kennedy's office is well-respected by trial judges, it is well-funded when compared to other public defender offices, and its attorneys have faced no claims of professional misconduct or malpractice.[6]

An example of "injury in fact" to a plaintiff alleging ineffective assistance of counsel due to excessive attorney caseloads can be found in the Supreme Court of Arizona's decision in *State v. Smith,* 140 Ariz. 355, 681 P.2d 1374, 1378 (1984). Smith argued on appeal from his burglary and assault conviction that he was denied effective assistance of counsel due to his attorney's "shocking, staggering and unworkable" caseload. *Id.* 681 P.2d at 1378–79. While the court did not find that Smith's attorney was incompetent, it used the occasion to assess the deficiencies of the Mohave County indigent defense system. *Id.* Mohave County utilized a bid system to award public defense contracts to private attorneys. This system awarded contracts to the lowest bidders, but failed to consider the time required to effectively represent clients, failed to account for support costs such as investigators, paralegals and secretaries, and did not consider the experience or competency of the attorney before awarding a contract. As a result of this county's system, defense counsel routinely accepted caseloads far in excess of the ABA's guidelines for awarding public defense contracts. For example, Smith's attorney handled a "part-time" caseload of 149 felonies, 160 misdemeanors, 21 juvenile cases and 33 other cases in the year Smith was convicted, in addition to a private civil practice. *Id.* at 1380. Smith also asserted that the attorney spent

"only two to three hours interviewing the defendant and 'possibly' six to eight hours studying the case." *Id.* at 1378. The Arizona Supreme Court therefore found that Mohave County's bid system violated the rights of defendants to due process and the right to counsel, and ordered that all subsequent convictions obtained using the same procedure would be presumed to be the product of a Sixth Amendment violation. *Id.* at 1381, 1384. The state would carry the burden of rebutting this presumption until the bid system was improved. *Id.* at 1384.

In 1993, the Supreme Court of Louisiana ordered a similar presumption of ineffective assistance of counsel for criminal convictions in New Orleans. *State v. Peart,* 621 So.2d 780, 783 (La.1993). The defendant Peart was charged with several felony offenses and his court-appointed attorney raised a Sixth Amendment argument before the trial court on the grounds that Peart was denied constitutionally-required defense resources by the city's indigent defense program. *Id.* at 784. The trial court found that when Peart's attorney was appointed to represent Peart, he was already assigned to 70 active felony cases, and had represented 418 defendants during a 7–month period. His clients were routinely incarcerated for 30 to 70 days before he could meet with them, and he had at least one serious felony case set for trial on every trial date during the period in question. *Id.* The supreme court considered these facts in its decision, and ordered that all defendants represented by New Orleans court-appointed attorneys would be presumed to have received ineffective assistance of counsel. *Id.* at 791.

Other courts have relied upon evidence of grossly overworked attorneys to revamp public defense systems under their jurisdic-

---

6. For example, the Minnesota State Public Defender, John Stuart, reports in an affidavit filed by the State that he has received "very few complaints from clients regarding service received from the Fourth Judicial District Public Defender's Office." In recent years, no Fourth District public defender has been disciplined for violations of the Rules of Professional Responsibility, nor has any court held that Kennedy's staff has provided ineffective assistance of counsel. In Stuart's opinion, the clients of Kennedy's office "receive good service" despite the high case-

loads, thanks to Kennedy's excellent full-time investigative, research and sentencing advocacy staff and his highly committed team of attorneys. In addition, the Chair of the Minnesota State Board of Public Defense, R. Peter Madel, Jr., submitted copies of numerous letters from Fourth Judicial District Judges written in support of Kennedy's bid for reappointment in the fall of 1992. These letters routinely refer to Kennedy's office in glowing terms, often expressing the view that Kennedy's office is one of the best public defense offices in the country.

tion. *See In re Order on Prosecution of Criminal Appeals by the Tenth Judicial Circuit Public Defender,* 561 So.2d 1130, 1139 (Fla.1990) (enormous backlog of appellate cases assigned to public defenders would support habeas corpus relief for indigent appellants unless new funds were appropriated within 60 days); *Hatten v. State,* 561 So.2d 562, 565 (Fla.1990) (excessive backlog of appellate filings in public defender's office amounted to ineffective assistance of counsel); *Luckey v. Harris,* 860 F.2d 1012 (11th Cir.1988); *State ex rel. Wolff v. Ruddy,* 617 S.W.2d 64, 66 (Mo.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982) (establishing temporary guidelines to solve problem of providing legal assistance to indigent defendants after state fund was exhausted).

The majority of the cases discussed above cite evidence of substandard representation by court appointed defense counsel, generally supplied by a particular defendant, as contributing to the court's decision to intervene. Kennedy, however, has not shown that his attorneys provide substandard assistance of counsel to their clients. *See Portman v. County of Santa Clara,* 995 F.2d 898, 903 (9th Cir.1993) (attorney who argued county's at-will employment policy interfered with his criminal clients' Sixth Amendment rights did not present justiciable claim due to his reliance on "hypothetical situations and hypothetical clients"); *Gardner v. Luckey,* 500 F.2d 712, 714–15 (5th Cir.1974), *cert. denied,* 423 U.S. 841, 96 S.Ct. 73, 46 L.Ed.2d 61 (1975) (threat of future injuries to criminal defendants, who claim their public defenders failed to provide effective legal assistance, was "too speculative" to provide a basis for judicial relief). *See also Dash v. Mitchell,* 356 F.Supp. 1292, 1295 (D.D.C.1972) (legal defense organizations alleged no direct or consequential detriment to their interests as a result of preventative detention program; thus there was no injury in fact as required by Article III).

In short, Kennedy's claims of constitutional violations are too speculative and hypothetical to support jurisdiction in this court. The district court did not find that Kennedy's staff had provided ineffective assistance to any particular client, nor did it find that Kennedy faced professional liability as a result of his office's substandard services. Nor do any of Kennedy's clients join him in attacking the statutory funding scheme at issue here by presenting evidence of inadequate assistance in particular cases. In light of Kennedy's failure to provide more substantial evidence of an "injury in fact" to himself or his clients, we hold that the district court erred in granting Kennedy's summary judgment motion.

Accordingly, the decision of the district court is reversed.

STRINGER, J., took no part in the consideration or decision of this case.