920 P.2d 290

**STATE of Arizona, Appellee,**

v.

**Robert Charles TOWERY, Appellant.**

No. CR–92–0493–AP.

Supreme Court of Arizona,
En Banc.

June 27, 1996.

Grant Woods, Arizona Attorney General by Paul J. McMurdie, Ronald L. Crismon, Phoenix, for State of Arizona.

Dean W. Trebesch, Maricopa County Public Defender by Terry J. Adams, Phoenix, for Robert Charles Towery.

## OPINION

FELDMAN, Chief Justice.

On October 3, 1991, Robert Charles Towery ("Defendant") and Randy Allen Barker were charged in Maricopa County on six counts: first-degree murder, armed robbery, first-degree burglary, kidnapping, theft, and attempted theft. About six months before trial, the trial judge granted Defendant's motion to sever. Defendant's murder trial began on August 3, 1992. Eleven days later, the jury found him guilty of felony murder and all other counts. At the sentencing hearing, the trial judge sentenced Defendant to death for the murder and to concurrent prison terms of five to twenty-one years for the other counts.

This automatic appeal of the death sentence followed. Ariz. Const. art. 6, § 5(3); A.R.S. §§ 13–4031 and 13–4033(A).

## STATEMENT OF FACTS

In exchange for a reduced charge of second-degree murder, Barker testified against Defendant and provided much of the State's evidence. Other witnesses corroborated some critical features of Barker's story and connected Defendant with the charged offenses. Nevertheless, the State's case rested on Barker's testimony. His version of the facts follows.

### A. Barker's story

Defendant, Barker, and John Meacham rented a three-bedroom house in Scottsdale, Arizona. Defendant occupied one bedroom with his girlfriend, Diane Weber, and her infant daughter. Barker occupied another bedroom with his then-girlfriend, Monique Rousseau. For several weeks, Defendant and Barker had discussed "pulling off a robbery" of one of two possible victims known to

Defendant. On September 4, 1991, they decided to rob Mark Jones at his home.

That evening they drove in Barker's car to a Denny's Restaurant where they called a taxi. The taxi dropped them off near Jones' home. They walked to the house and knocked on the door. When Jones answered, Defendant said his car had broken down and asked if he and Barker could come in to use the telephone. Defendant asked Jones, "Do you remember me? I'm from R and D Automotive." Jones had been introduced to Defendant on a prior occasion when Defendant sought counseling about his new business enterprise. Jones invited them in and showed them the telephone. While Barker faked a telephone call, Defendant opened his briefcase and pulled out a gun. The briefcase also contained gloves, plastic tie wraps, handcuffs, and a large veterinary syringe apparently filled with battery acid. After Defendant and Barker put on gloves, Barker handcuffed Jones. Defendant rummaged through the house, took Jones' car keys, and loaded Jones' Lincoln with a television, photocopy machine, cameras, jewelry, and other items. Defendant removed Jones' wallet from his back pocket and took about $200 and credit cards. They also took $1,000 from a desk drawer.

Before leaving, Defendant and Barker took Jones to the master bedroom at gunpoint, uncuffing him while he used the bathroom along the way. They asked him whether he was expecting anyone soon, and Jones said no. According to Barker, Defendant offered Jones "about two choices in the matter of how we could leave him. One was ... [to] tie him up, ... the other was to introduce a drug into him to make him sleep instead of being tied up." Jones chose to be put to sleep and was laid face down on the bed with his hands bound behind his back. Contrary to his statement to Jones, Defendant apparently believed the injected substance would kill Jones.

At his request, Jones' shoes were removed to make him more comfortable. Defendant made several attempts to inject the contents of the syringe into Jones' arm, pushing the needle all the way through a vein. The drug having no effect, Jones pretended to sleep by

snoring. Determined to kill Jones, Defendant made a noose out of plastic tie wraps from his briefcase, slipped it over Jones' head, and pulled tightly on its end to strangle Jones. Jones did not struggle but made choking and gagging sounds. Defendant then cut and removed the tie-wrap noose from Jones' neck. Believing Jones was not yet dead, Defendant made another noose "like the first one ... popped [it] over the head, and pulled tight with a 'zip' sound," explained Barker.

The two men then loaded a large television into Jones' other car, a Dodge convertible. While trying to start the Dodge, Barker set off its alarm. Barker jumped into the Lincoln and the two men drove away with Defendant at the wheel. Barker allegedly threw the empty syringe out the window into an oleander hedge [1] as they drove back to Denny's to get Barker's car. They returned to their home, unloaded the goods, putting some into Meacham's bedroom, and removed a compact disk player from the Lincoln's dash. Defendant then drove the Lincoln to the parking lot of an apartment complex while Barker followed in his car. They parked the Lincoln there and returned home. A security guard at the complex saw the men and later identified Defendant in a photo lineup.

The next morning, Meacham returned from work to discover in his bedroom items he had not seen before. Defendant, Barker, and Diane were also in the house. Meanwhile, two employees of the golf club that Jones frequented had looked for Jones and found his body about mid-morning that day.

## B. Defendant's version

Defendant testified and offered an alibi. According to Defendant, on the night of the robbery he had driven Barker to Denny's in Barker's car. He had a soda until Barker's taxi arrived, then drove to Zorba's, an adult book store, where he had arranged to meet Tina Collins. While waiting, Defendant went inside to buy a book and returned to his car. Tina arrived at Zorba's about fifteen minutes after Defendant. They then drove and parked near Defendant's home, talking for about two hours in the car. Defendant returned to Zorba's, dropped Tina off, and went to meet Barker at a Circle K near their house. Because Barker was not there as planned, Defendant went home. Barker soon arrived home with a stolen car and stolen property. Defendant claimed he helped Barker unload the goods and dispose of the stolen car. To account for the stolen property police found in his possession, Defendant claimed he had bought the items from Barker.

Tina Collins testified by videotape and gave the following story, corroborating Defendant's version. She first met Defendant about two weeks before the murder at a party, where they discussed performing a sex act on Defendant's girlfriend and arranged to meet again on September 4. They talked over the telephone on September 4 and planned to meet at nine o'clock that night to negotiate a deal. Tina did not arrive until 9:10 or 9:15 and joined Defendant in a black TransAm he was driving. They drove to the parking lot of an office building, talked for an hour, went to a convenience store for sodas, and returned to the parking lot to talk some more. After meeting for a couple of hours, Defendant drove Tina back to Zorba's. When asked whether she saw any unusual equipment in the car, Tina said she saw a gun and a police scanner, which she first thought was a walkie-talkie. Nothing in the record disputes Tina's professed observations.[2]

---

1. Police later searched the area for the syringe but never found it.

2. Tina said she did not talk with Defendant again until February 9, when she visited him in prison. According to Tina, she learned from her friend Judy that Defendant was in prison. Judy had been visiting Defendant's cellmate, a man named Paul. While Judy visited Paul, she telephoned Tina and told her that Paul had a friend who wanted to meet her. Tina had previously visited and befriended inmates she did not know. When Defendant got on the telephone, he and Tina recognized each other. Thereafter, Tina visited Defendant in prison regularly.

The prosecutor suggested in closing argument that Tina had never met Defendant until she visited him in prison after the murder and that she therefore fabricated her alibi testimony to help Defendant. Reporter's Transcript, Aug. 13, 1992, at 61.

The jury apparently believed Tina and Defendant less than Barker and found Defendant guilty of first-degree murder. At the sentencing hearing, the trial judge found three statutory aggravating factors and two mitigating factors. In aggravation, the State proved that Defendant (1) had been convicted of a crime for which a life sentence was imposable,[3] (2) committed the murder for financial gain,[4] and (3) committed the murder in an especially cruel, heinous, or depraved manner.[5] The judge found that the mitigating factors, Defendant's drug-impaired capacity to conform his conduct to the law and his codefendant's lenient plea-bargained sentence, were not sufficiently substantial to call for leniency. Accordingly, the judge sentenced Defendant to death.

## DISCUSSION

Defendant takes issue with a number of the trial judge's procedural rulings, arguing that they constituted reversible error. He also challenges the trial judge's findings at the sentencing hearing and the constitutionality of Arizona's death penalty scheme. We consider each of Defendant's arguments.

### TRIAL ISSUES

#### A. Limiting cross-examination of an accomplice witness

Defendant contends that by twice limiting his cross-examination of Barker, the trial judge violated his right under the Sixth and Fourteenth Amendments to confront a key witness. In one instance the judge prohibited the defense from asking Barker what his attorney had said to him about his chances of receiving the death penalty without a plea bargain. In the second instance, the judge barred the defense from probing Barker about his belief in the occult. Defendant charges that both of these rulings infringed his right to effectively cross-examine an important witness and were fundamental error.

#### 1. The confrontation right and the attorney-client privilege

To show Barker had a motive to testify for the State and inculpate Defendant, even if he had to lie, Defendant cross-examined Barker about benefits he expected in return for his plea agreement. Defendant asked Barker whether his attorney had told him that the State might seek the death penalty if Barker did not cooperate with the prosecutor. Barker's lawyer was present and objected on grounds of attorney-client privilege, and the judge sustained the objection.

▉ A defendant has great latitude to cross-examine an "accomplice or co-defendant who has turned State's evidence and testifies on behalf of the State in a trial of his co-defendant." *State v. Morales,* 120 Ariz. 517, 520, 587 P.2d 236, 239 (1978) (citations omitted). A trial judge who excludes testimony that would show bias and interest in this circumstance may commit reversible error. *Id.* Even if the defendant fails to object or give an offer of proof when such testimony is precluded, error may be found if the context of the questions makes their purpose clear. Ariz. R. Evid. 103(a).

▉ If cross-examination into privileged areas is necessary to show a witness' bias, the United States Supreme Court has held that the interest of confidentiality can be "outweighed by [the defendant's] right to probe into the influence of possible bias in the testimony of a crucial identification witness." *See Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). In the few reported cases in which the confrontation right has collided with the attorney-client privilege, courts have employed a fact-specific balancing test to resolve the competing interests of confidentiality and the defendant's right to impeach an important government witness. *See, e.g., State v. Cascone,* 195 Conn. 183, 487 A.2d 186, 190–91 (1985) (trial court's exclusion of a co-defendant's pretrial statement to his attor-

---

3. A.R.S. § 13–703(F)(1) and (2). Defendant had been convicted of committing four counts of armed robbery while on parole. A life sentence for the conviction was therefore mandatory.

4. A.R.S. § 13–703(F)(5).

5. A.R.S. § 13–703(F)(6).

ney that would exculpate the defendant was not harmless error).

In *United States ex. rel. Blackwell v. Franzen,* the court balanced the relevant interests:

[T]he question in each case must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony. To answer that question the court must look to the record as a whole and to the alternative means open to the defendant to impeach the witness. The court must ultimately decide whether the probative value of the alleged privileged communication was such that the defendant's right to effective cross-examination was substantially diminished.

688 F.2d 496, 500–01 (7th Cir.1982) (citations omitted), *cert. denied,* 460 U.S. 1072, 103 S.Ct. 1529, 75 L.Ed.2d 950 (1983).

In *Franzen,* the defendant cross-examined his accomplice, who had agreed to testify for the state. The defendant elicited testimony from the witness that he had told his own attorney "he was beaten [by the prosecutor] into making that statement [that inculpated defendant]" to show that the prosecutor had induced the accomplice to incriminate the defendant. *Id.* at 499. The state objected, and the trial court sustained the objection on grounds that the attorney-client privilege "overrides any relevancy it may have to the issues in [the] case." *Id.* However, because there was already ample evidence in the record to impeach the accomplice's testimony, the circuit court upheld the trial court's ruling. *Id.* at 501; *see also Neku v. United States,* 620 A.2d 259, 263 (D.C.1993), *cert. denied,* 510 U.S. 1003, 114 S.Ct. 577, 126 L.Ed.2d 476 (1993).

As long as the jury heard evidence relevant to Barker's possible motives for testifying against Defendant, we assume it could then fairly assess Barker's truthfulness. No doubt Barker's plea agreement was relevant

to his bias and interest. The jury apparently realized this and sent a note to the judge during deliberations asking what benefits Barker received in exchange for his testimony. Reporter's Transcript (R.T.), Aug. 13, 1992, at 110. The jury's note asked, "Does Randy Barker have anything to gain if Towery is convicted? Are we allowed to see the plea agreement?" In response to the note, the judge told the jurors they had all the evidence and instructed them to rely on their personal recollections and collective notes.

■ At issue then is whether the jury knew what benefits Barker would receive from his plea bargain. If the statement made to Barker by his lawyer was sufficiently probative of Barker's credibility to outweigh the interests protected by the attorney-client privilege,[6] then the judge abused her discretion in prohibiting Defendant from asking about a privileged communication.

■ The record shows that even without disclosure of whether Barker's lawyer told Barker that the State would seek the death penalty if he did not cooperate, other evidence informed the jury that Barker knew he could escape death by cooperating and testifying. The jury knew that the State would have pursued the death penalty if Barker were convicted of first-degree murder. Earlier in the day, the jury heard a stipulation that prior to Barker's plea agreement the State had filed a notice of intent to seek the death penalty if Barker were convicted of first-degree murder. The jury knew that Barker then made a plea agreement with the State for second-degree murder. In short, although the jury questioned Barker's benefits if Defendant were *convicted,* as evidenced by the note to the judge, the jury must have understood all of the benefits Barker received from his plea agreement and testimony when it decided Defendant's guilt. The evidence would have been merely cumulative had the judge permitted Defendant to ask about Barker's privileged communication with his attorney. Moreover, in protecting

**6.** The attorney-client privilege, the "oldest of the privileges for confidential communications known to the common law," has been rigorously guarded "to encourage full and frank communication between attorneys and their clients and

thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981).

the attorney-client privilege, the judge did not impair Defendant's ability to obtain the information he wanted. Defense counsel could have established a motive for Barker to lie without invading the attorney-client privilege. He simply could have asked if Barker knew or believed he would have been eligible for the death penalty or a life sentence had he not agreed to testify. In upholding the privilege, therefore, the judge did not abuse her discretion.

### 2. Cross-examination of Barker's belief in satanism

On cross-examination, the defense asked Barker about his belief in the occult after he revealed that he had dialed straight sixes while feigning a telephone call from the victim's house.[7] The judge sustained the State's objection on grounds of relevance, basing her ruling on Ariz. R. Evid. 610 and art. 2, § 12 of the Arizona Constitution.[8] These provisions bar questioning a witness about religious beliefs as a way to enhance or attack the witness' credibility. On appeal, Defendant contends that testimony about Barker's religious beliefs, if such they were, was not offered to impeach his credibility but to show that the antisocial tenets of his beliefs disposed Barker to engage in criminal conduct and to commit the murder.

A witness' religious beliefs are admissible if offered for some legitimate purpose other than attacking witness credibility. See State v. West, 168 Ariz. 292, 296, 812 P.2d 1110, 1114 (1991) (reference to religion is proper when used to justify defendant's conduct); State v. Stone, 151 Ariz. 455, 458, 728 P.2d 674, 677 (App.1986) (if evidence of religious belief "is probative of something other than veracity, it is not inadmissible simply because it may also involve a religious subject as well."). Defendant argues that the evidence was relevant to an issue other than Barker's veracity. Had he been allowed to develop testimony about Barker's satanic beliefs, the jury might have been persuaded to believe that Barker, not Defendant, was the killer. In addition, although the jury nevertheless could have found Defendant's involvement sufficient to convict him for felony murder, his death eligibility was not a foregone conclusion. Although the judge found beyond a reasonable doubt that Defendant was the killer, evidence that Barker was profoundly touched by some satanic belief might have altered that finding.

Defendant, however, made no offer of proof of what Barker's testimony would have shown. Nor does the context of the question indicate the nature of Barker's satanic belief or show it was substantively

7. During cross-examination, Barker was asked what number he dialed when he pretended to use the telephone in Jones' house. Barker responded, "I dialed straight sixes." The testimony continued:

Q: Why did you dial those numbers?
A: Because of—I used to have an old belief in the occult.
Q: When did you do away this that belief?
Mr. Ditsworth [for the State]: Relevance, Your Honor.
The Court: Sustained.
Mr. Hazel [for Defendant]: Pardon me, Your Honor, I didn't—
The Court: Sustained.
Mr. Hazel: Your Honor, can we approach on that point?
The Court: Later.
Mr. Hazel: But, in fact, you had an alter [sic] in your—a Satanic alter in your room; is that correct?
Mr. Ditsworth: Same objection.
The Court: Sustained.
R.T., Aug. 5, 1992, at 112–13.
After excusing the jury, the judge asked defense counsel why the ruling should be reversed.

Counsel explained that he had seen what looked like a satanic altar in a photograph of Barker's bedroom and wanted to ask Barker to confirm its identity. He continued, "I think it's important that the jury know that he has some different type of beliefs that other people may not." The trial judge asked for case law showing that satanism was an exception to the rule prohibiting a party from introducing evidence of a witness' religious beliefs. Id. at 140–41. Counsel agreed to find authority but never offered any.

8. Ariz. R. Evid. 610 provides:

Evidence of the beliefs or opinions of a witness on matters of religion is not admissible *for the purpose of showing that by reason of their nature his credibility is impaired or enhanced.* (Emphasis added.)
Art. 2, § 12 of the Arizona Constitution states: No ... person [shall] be incompetent as a witness or juror in consequence of his opinion on matters of religion, nor be questioned touching his religious belief in any court of justice *to affect the weight of his testimony.* (Emphasis added.)

relevant. When an objection to the introduction of evidence has been sustained, an offer of proof showing the evidence's relevance and admissibility is ordinarily required to assert error on appeal. *State v. Bay,* 150 Ariz. 112, 115, 722 P.2d 280, 283 (1986); MORRIS K. UDALL ET AL., ARIZONA PRACTICE: LAW OF EVIDENCE § 13, at 20 (2d ed.1982). Given that counsel normally does not know in advance what a hostile witness will say on cross-examination, the offer-of-proof requirement for considering a claim on appeal may be relaxed when the court sustains an objection to a question asked on cross-examination. JOHN W. STRONG, ET AL., 1 MCCORMICK ON EVIDENCE § 51, at 197 (4th ed.1992). Even so, something more than speculation about possible answers is required to show prejudice. At a minimum, an offer of proof stating with reasonable specificity what the evidence would have shown is required. *See id.* at 197–98. In Arizona, it has been suggested that counsel be required to discover evidence that would make the proffered testimony relevant and make it known to the court. *State v. Quinn,* 121 Ariz. 582, 585, 592 P.2d 778, 781 (App.1978).

 We recognize, however, that discovery in criminal cases is much more limited than in civil cases. Victims of crimes, for example, can refuse interview requests by defense counsel under the Victims' Bill of Rights. Ariz. Const. art. 2, § 2.1; Ariz. R.Crim. P. 39(b)(11). Nonetheless, when the context of the examination fails to reveal the nature of the expected answer, the proponent of the precluded evidence must seek permission from the trial judge to make the offer of proof so that the reviewing court can determine whether the trial judge erred in precluding the evidence. STRONG, ET AL., *supra* § 51, at 197 n. 10; *see also State v. Affeld,* 307 Or. 125, 764 P.2d 220, 222 (1988). It is remotely conceivable that Barker might have revealed he was driven by a satanic force or some other evil belief to commit criminal acts. The only hint of a satanic motive for Barker's participation in the crime, however,

was his dialing sixes on the telephone. That alone has little probative value in establishing a motive to kill. Assuming Barker had a satanic altar in his room, Defendant failed to discover how often Barker used it and how its use was related to his criminal conduct. In fact, Barker's claim that he used to believe in the occult indicates that the alleged altar no longer had any religious significance to him. Defendant's failure to establish the connection between Barker's old belief in the occult and the crime by an offer of proof in the record makes it impossible to evaluate whether the trial judge unfairly limited Defendant's cross-examination of Barker. On this record, we see no probative value in the precluded evidence apart from its effect on Barker's credibility. Thus we find no error in the judge's precluding it.

## B. Defendant's right to a free transcript of a previous, unrelated trial

Before trial, Defendant asked the court by written motion to provide a free transcript of a prior trial in which he had been convicted of armed robbery. That trial took place in mid-March 1992, about six months after Jones' murder and about five months before Defendant's homicide trial. He stated that he needed the transcript because the prosecutor had filed notice that the State intended to call witnesses from the armed robbery trial.[9] The judge denied his request on grounds that "no good cause has been shown for the need of the trial transcripts," advising him to renew his motion "setting forth some facts which demonstrate an actual need other than the bare conclusion that he needs the transcript 'to prepare a defense'." Minute Entry, June 13, 1992, at 19. Defendant made no further request for the transcript. On appeal, Defendant claims that in denying him valuable defense information, the judge violated his equal protection and due process rights.

 The United States Supreme Court has held that requiring an indigent

9. Defendant used plastic tie wraps, like the ones used during Jones' murder, during the armed robbery. He had also used a police scanner in the armed robbery. Barker told police that Defendant took a police scanner to Jones' house.

The State wanted to call the armed robbery victim to prove the identity of Jones' killer and filed a motion to admit prior bad acts. The State later withdrew its motion.

defendant to demonstrate a particularized need for a free transcript of a prior mistrial or preliminary hearing can violate equal protection. *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 433–34, 30 L.Ed.2d 400 (1971); *Roberts v. LaVallee,* 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); *Griffin v. Illinois,* 351 U.S. 12, 17, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956) ("In criminal trials, a State can no more discriminate on account of poverty then on account of religion, race, or color."). Only *financial* need, not particularized need, must be shown. *Britt* held that two factors are relevant in determining if a trial court has erred by refusing an indigent defendant a free trial transcript: (1) the value of the transcript to the defendant for an effective defense at trial or on appeal, and (2) "the availability of alternative devices that would fulfil the same functions as the transcript." *Britt,* 404 U.S. at 227, 92 S.Ct. at 434.[10] The transcript from a prior mistrial has been recognized as a valuable resource for impeaching witnesses, guiding discovery, and developing trial strategy. *Id.* at 232, 92 S.Ct. at 436 (Douglas, J., dissenting). Thus, when a transcript from a mistrial is requested for use at the retrial, the value of the transcript is generally presumed without a showing of specific need. *United States v. Rosales–Lopez,* 617 F.2d 1349, 1355–56 (9th Cir.1980), *aff'd,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). A preliminary hearing transcript may also be presumed to have value in connection with a pending trial. *See id.*

In this case, however, Defendant asked for a free transcript of his trial on an unrelated charge. Our cases have held that there is no presumed value to the defense in the transcript of a co-defendant's trial. *See State v. Tison,* 129 Ariz. 526, 540, 633 P.2d 335, 349 (1981) (indigent defendant must show special need in requesting a transcript of co-defendant's trial), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982); *State v. Razinha,* 123 Ariz. 355, 358, 599 P.2d 808,

811 (App.1979) (citing cases). *But see State v. Campbell,* 215 N.W.2d 227 (Iowa 1974). Although the present question is one of first impression for this court, we partially answered it in *Tison.* Tison claimed the trial judge erred in denying him a free transcript of his co-defendant's trial on the same charges. In holding that there is no presumed value of a co-defendant's trial transcript even when the same witnesses are called, we emphasized that the constitution does not require the State to provide *every* service that "might be of benefit to an indigent defendant ... but only to assure the indigent defendant an adequate opportunity to present his claims fairly...." *Tison,* 129 Ariz. at 540, 633 P.2d at 349, quoting *Ross v. Moffitt,* 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 L.Ed.2d 341 (1974).

 Because a mistrial effectively serves as a "dry run" of the State's case, a transcript is ordinarily considered invaluable as a discovery device and tool for impeaching prosecution witnesses at the subsequent trial. *Britt,* 404 U.S. at 228, 92 S.Ct. at 434. But when the transcript sought is that for an unrelated charge—even against the same defendant—the crime, victim(s), time, place, facts, and witnesses are ordinarily different. Thus, the rationale for the presumption of need does not apply to a transcript of the defendant's trial on unrelated charges. Its value must be established, and unless the defendant demonstrates a specific need for the trial transcript, the court does not err in concluding that the transcript is not necessary for an effective defense. The mere fact that a witness who testified at the first, unrelated trial may be called at the second is not sufficient for a presumption of value. *See Fisher v. Hargett,* 997 F.2d 1095, 1098 (5th Cir.1993) (free transcript of a prior trial involving a different victim and offense at a different time not constitutionally required); *McAllister v. Garrison,* 569 F.2d 813, 815 (4th Cir.1978) (holding that defendant must

---

**10.** In *Britt* the Court upheld the trial court's decision not to provide a transcript to the defendant. The same judge presided, and the same counsel appeared. Because the same court reporter, who knew the attorneys and the judge, was present and could have readily provided defense counsel with transcriptions from the pri-

or mistrial if informally asked, the Court found that the defendant had adequate alternative devices available. *See State v. Tomlinson,* 121 Ariz. 313, 589 P.2d 1345 (App.1978) (reviewing state and federal cases on whether the defendant had an adequate alternative device for a trial transcript).

make a reasonable showing of transcript's value even though common witnesses called), *cert. denied*, 436 U.S. 928, 98 S.Ct. 2824, 56 L.Ed.2d 771 (1978). When asking for a free transcript of an unrelated trial, therefore, a defendant may be required to demonstrate some reasonable probability of defense value.

Defendant said he needed the robbery trial transcript because the State intended to call common witnesses from the armed robbery trial. Despite the judge's request, Defendant made no further showing of particularized need for the transcript. Without a sufficient showing of the transcript's value for an effective defense, the judge did not err in denying Defendant a free copy. We reach this conclusion, as we must, the same way the judge did, on the record as it then existed.

Although the robbery victim did not testify at the homicide trial, three other witnesses testified at both trials. At the murder trial, one of these witnesses, Defendant's roommate John Meacham, testified that he overheard Defendant make an inculpatory statement. The same prosecutor had elicited similar testimony from Meacham at the robbery trial. Defendant argues that the statements attributed to him by Meacham refer to the same incident but were introduced at two separate trials to prove two separate crimes. Because Defendant had different lawyers at each trial, his trial lawyer in the present case may not have known about Meacham's previous testimony without reading the transcript.

■ Defendant is correct that the transcript of Meacham's robbery trial testimony might have alerted defense counsel that the State was making inconsistent use of Meacham's testimony. Thus the transcript might have helped impeach Meacham at the murder trial.[11] His testimony at both trials was offered to prove Defendant's culpability in unrelated crimes. But neither Defendant nor the trial judge could have reasonably anticipated that the prosecutor would make

inconsistent use of the same testimony. Because the prosecutor did not inform the court of his intent to elicit the same testimony from an unrelated trial, the court had no way of knowing that the requested transcript might help the defense. If the transcript would have been valuable to Defendant, any prejudice caused by the denial of a free copy was attributable not to the trial judge, who ruled correctly on the record before her, but to the prosecutor. Thus, we find no equal protection violation.

## C. Defendant's inculpatory statement— judicial estoppel and prosecutorial misconduct

At Defendant's prior armed robbery trial Meacham testified that he overheard Defendant say, "I tried to get this old man to do what I wanted him to do, but he wouldn't do it." *State v. Towery*, Maricopa County No. CR 91–02512, R.T., Mar. 10, 1992, at 98. At the homicide trial, Meacham was again called to testify. His testimony approximated the testimony he gave in the armed robbery trial: he said that he heard Defendant tell Barker that he was "having a hard time with an old man so he had—he had a hard time tying him up, so he had to knock him down." The victims of both crimes were older men.

Because Defendant had different counsel at the two trials and was denied a transcript of the robbery trial, we must assume that his trial attorney in the present case did not know the substance of Meacham's testimony at the robbery trial. Moreover, before putting Meacham on the stand in the murder trial, the prosecutor failed to notify the court or defense counsel that he would present evidence of the same admission Meacham described in the robbery trial. The context of Meacham's testimony at both trials makes it quite clear, and the State concedes, that Meacham heard one admission about one crime. But the admission was used in two trials to help prove two unrelated criminal acts. Defendant claims that by presenting evidence of a single incident at two separate

---

11. We note that the transcript would have been of no value to Defendant insofar as it pertained to the testimony of two of the common witnesses. These witnesses were police officers who had been involved in the robbery and murder investi-

gations. They testified at this trial only about items seized in the murder investigation. The robbery trial transcripts of these two witnesses would have been useless to the defense for discovery or impeachment purposes.

trials to prove two separate, unrelated crimes, the prosecutor violated Defendant's due process rights and the doctrine of estoppel by engaging in misconduct.

### 1. Judicial Estoppel

■ Defendant argues that "the prosecutor [used] the same evidence to convict the appellant of two separate crimes ... attempting to prove a fact in one trial and seeking to prove an inconsistent fact in another trial with the same evidence." Opening Brief at 32. The error in using the evidence, in Defendant's words, is that it "'perverts' the integrity of our system of jurisprudence." *Id.* at 35. Protecting the integrity of the judicial process is the universally recognized purpose of judicial estoppel. *See, e.g.,* 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4477 (1981 and Supp.1990); 1B J. MOORE, J. LUCAS & T. CURRIER, MOORE'S FEDERAL PRACTICE 405[8], at 239, 240 (2d ed.1988); *Scarano v. Central R.R.,* 203 F.2d 510, 513 (3d Cir.1953).

■ Judicial estoppel prevents a party from taking an inconsistent position in successive or separate actions. This court has long recognized that

[a]s a general rule, a party who has assumed a particular position in a judicial proceeding is estopped to assume an inconsistent position in a subsequent proceeding involving the same parties and questions.

*Martin v. Wood,* 71 Ariz. 457, 459, 229 P.2d 710, 711–12 (1951) (citing 31 C.J.S. ESTOPPEL § 119, at 381). Judicial estoppel is not intended to protect individual litigants but is invoked to protect the integrity of the judicial process by preventing a litigant from using the courts to gain an unfair advantage. *See* 31 C.J.S. ESTOPPEL § 121, at 260; *see also Yanez v. United States,* 989 F.2d 323, 326 (9th Cir.1993); *Yniguez v. Arizona,* 939 F.2d 727, 739 (9th Cir.1991); *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991); *In re Cassidy,* 892 F.2d at 641. Although judicial estoppel is usually invoked in civil cases,[12] courts have also ap-

plied it in criminal cases. *See, e.g., State v. Washington,* 142 Wis.2d 630, 419 N.W.2d 275, 277 (App.1987).

■ The doctrine's application to criminal cases usually involves a defendant who asserts one position at trial and another on appeal. See *Harrison v. Labor & Indus. Review Comm'n,* 187 Wis.2d 491, 523 N.W.2d 138, 140 (App.1994). Nonetheless, criminal courts have indicated that judicial estoppel would preclude the state from changing its version of the facts in separate proceedings involving the same matter to 'protect the defendant's right to due process. See *People v. Gayfield,* 261 Ill.App.3d 379, 199 Ill.Dec. 123, 128–29, 633 N.E.2d 919, 924–25 (1994) (suggesting that the state would be estopped from inconsistently claiming in separate proceedings that different defendants shot the same victim); *Russell v. Rolfs,* 893 F.2d at 1037–39 (state prohibited from arguing that criminal defendant's appellate petition is procedurally barred in state court after successfully arguing in district court that defendant had an adequate state remedy).

We believe the doctrine of judicial estoppel is no less applicable in a criminal than in a civil trial. Any other rule would permit absurd results. For example, if the state had evidence that a defendant admitted robbing *the* convenience store, absent judicial estoppel the state could use that evidence to convict the defendant of every convenience store robbery in the city, affirming the evidence as relevant in each case, all the while knowing that the defendant made only one admission of a single act.

■ Three requirements must exist before the court can apply judicial estoppel: (1) the parties must be the same, (2) the question involved must be the same, and (3) the party asserting the inconsistent position must have been successful in the prior judicial proceeding. See *Standage Ventures, Inc. v. State,* 114 Ariz. 480, 562 P.2d 360 (1977). In the present case the parties are the same. Because Defendant's admission could only pertain to one of the crimes, the question involved in both proceedings is also the same: did Defendant admit committing

---

12. *See, e.g., State v. Ellison,* 26 Ariz.App. 547, 549, 550 P.2d 101, 103 (1976).

the charged crime in Meacham's presence? However, even though the parties and the questions are the same, a majority of courts, including Arizona, refuse to invoke judicial estoppel unless the position first asserted was successfully maintained.[13] *Taylor v. State Farm Mutual Auto. Ins. Co.*, 182 Ariz. 39, 44, 893 P.2d 39, 44 (App.1995), *vacated in part*, 185 Ariz. 174, 913 P.2d 1092 (1996).

■■■ The prior position was successfully maintained only if the party gained judicial relief as a result of asserting the particular position in the first proceeding. *See id.* at 44, 893 P.2d at 44; *Standage*, 114 Ariz. at 484, 562 P.2d at 364; *State Farm Auto. Ins. Co. v. Civil Service Employees Ins. Co.*, 19 Ariz.App. 594, 600, 509 P.2d 725, 731 (1973). Prior success has also been defined as requiring that the court in the prior action accepted the first position. *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir.1982); *see also Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (1993) (litigant must obtain victory on prior ground); Rand G. Boyer's, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel*, 80 Nw. U.L. REV. 1244, 1256 (1986) (the requirement of prior judicial acceptance "is satisfied whenever a prior court 'has adopted the position [contrary to that now] urged by that party, either as a preliminary matter or as part of a final disposition.'") (citations omitted) (alterations by author).

■■■ Prior success is a prerequisite to the application of judicial estoppel because absent judicial acceptance of the prior position, there is no risk of inconsistent results. *See Edwards*, 690 F.2d at 599; *see also* Boyers, *supra*, 80 Nw. U.L. REV. at 1253. Because the judicial process is unimpaired absent inconsistent results, and because judicial estoppel is recognized to protect the integrity of the judicial process, invocation of the doctrine is unwarranted without prior success on—or judicial acceptance of—the first posi-

tion. *See USLIFE Corp. v. U.S. Life Ins. Co.*, 560 F.Supp. 1302, 1305 (N.D.Tex.1983) (citing *Edwards*, 690 F.2d at 599); C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE & PROCEDURE § 4477 (1983).

■■■ The guilty verdict on the armed robbery charge establishes that the jury accepted the State's position that Defendant committed that crime. The robbery verdict does not, however, establish that Defendant's admission to committing the armed robbery was a key element of the guilty verdict. Indeed, it is entirely possible that the jury in that case gave little or no consideration to Meacham's testimony, especially if his testimony constituted only an insignificant fraction of the total evidence offered to establish Defendant's guilt. *See* Boyers, *supra*, Nw. U.L. REV. at 1257. For this reason, judicial estoppel is generally not applied when the first inconsistent position was not a significant factor in the initial proceeding. *Id.* at 1263.

> Rather, the court, keeping in mind the 'unnecessary hardship' that may result from invoking judicial estoppel when the position was unimportant in the initial proceeding, determines whether the importance of the issue in the particular case justifies invocation of the doctrine.

*Id.* (citations omitted).

Thus, to determine if the prior success requirement for invocation of judicial estoppel was met in the armed robbery trial, this court must examine the record of that trial to determine whether Meacham's testimony was arguably significant to the jury's determination of Defendant's guilt. *Id.* In other words, can we conclude that the judicial relief obtained by the State in the armed robbery conviction was arguably due to Meacham's testimony? *See Standage*, 114 Ariz. at 484, 562 P.2d at 364.[14]

---

13. The minority view allows judicial estoppel "even if the litigant was unsuccessful in asserting the inconsistent position, if by his change of position he is playing 'fast and loose' with the court." *Keenan v. Allan*, 889 F.Supp. 1320, 1360 (E.D.Wash.1995), quoting *Morris v. California*, 966 F.2d 448, 452–53 (9th Cir.1991), *cert. denied*, 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992).

14. Although Defendant supplemented his brief with the portion of the transcript of the armed robbery trial containing Meacham's examination, he did not provide this court with the entire transcript. We later ordered that the record of Defendant's prior armed robbery trial be produced in its entirety and included as part of this record.

Having reviewed the entire record of the armed robbery trial, it is clear that Meacham's testimony was an insignificant factor in obtaining a conviction in that trial. All four robbery victims separately identified Defendant from a photographic line-up. They also testified at trial. When Defendant was arrested for the armed robbery, he had four credit cards of one of the victims in his wallet. In his home police found a gun identified by one of the victims as the gun used in the robbery, as well as clothing similar to that worn by the perpetrator of the robbery. Defendant also had a police scanner on his person when arrested; the robbery victims noted that the robber had an identical police scanner with him at the time of the crime. The license plate of the car Defendant drove to the robbery matched that of Barker's car, and Meacham testified that Defendant had access to Barker's car. Meacham's testimony about Defendant's admission came in as an unresponsive answer to a single question and was never mentioned again in the examination of Meacham or any other witness. The prosecutor never referred to Defendant's alleged admission in his opening statement or closing argument.

■ We conclude that Meacham's testimony about Defendant's inculpatory statement was at most an insignificant factor in light of the overwhelming evidence of Defendant's guilt on the armed robbery charge. Because judicial estoppel is to be invoked cautiously, on these facts we are unprepared to say that the prior position was successfully maintained. We therefore decline to invoke judicial estoppel here to preclude Meacham's testimony at the murder trial. Thus, we examine whether the prosecutor's actions constituted misconduct justifying reversal.

## 2. Prosecutorial misconduct

■ At oral argument before this court, the State conceded that the prosecutor elicited testimony of an admission about a single incident to help establish Defendant's guilt of two unrelated crimes. The prosecutor justi-

fied his actions by telling this court that he had been mistaken about presenting Defendant's admission at the robbery trial. As the murder investigation developed, the prosecutor became less convinced that Defendant's admission related to the armed robbery and more convinced that Defendant had been describing events of the murder. The State supported its use of Defendant's admission at the murder trial because it was made after the murder, better fit the facts of the murder,[15] and was therefore relevant evidence in the murder trial. The State submits it was for the jury to decide what weight to give Meacham's testimony. Further, the State argues that Defendant was free to ask Meacham questions that would have explained the alleged admission, thereby attributing the admission to the robbery rather than to the murder.

Even accepting the prosecutor's assertion that he decided in good faith that the inculpatory statement referred to the murder charge, we believe it improper for the State to fail to first notify defense counsel and the court of its intent to use evidence in this manner. While the robbery conviction awaited review by the court of appeals, the prosecutor made no effort to inform that court or defense counsel that he believed the admission did not relate to the robbery but to the murder, and had been improperly admitted in the first trial and properly used in the second. Nor did the prosecutor raise the matter after affirmance of the robbery conviction by the court of appeals. *State v. Towery*, No. 1 CA–CR 92–0831, Mem. Dec. (Ct.App. filed Sept. 29, 1994). When Defendant petitioned us to review that case, the State did not inform this court that Defendant's robbery conviction may have been based in part on improperly admitted evidence. This court denied review on March 21, 1995. If Defendant's inculpatory statement referred to the murder case, as the State now argues, the prosecutor should have informed the court and Defendant that he had presented irrelevant evidence at the robbery trial. At the very least, the prosecutor

15. The prosecutor explained at oral argument that the oldest victim of the previous crime was 55 years old. Jones was 68 years old when he was murdered. Defendant's reference to an "old man" convinced the prosecutor that Defendant had been discussing Jones rather than the robbery victim when Meacham overheard him.

had a duty to give notice in one case or the other that the admission of a single incident had been used to help convict Defendant of unrelated charges. His failure to give notice in either case constitutes misconduct.

■■■■ Having concluded that the prosecutor's actions constituted misconduct, we consider whether Defendant suffered prejudice mandating a new trial. *See* Ariz. R.Crim. P. 24.1. We are not eager to reverse a conviction on grounds of prosecutorial misconduct as a method to deter such future conduct. See *State v. Valdez*, 160 Ariz. 9, 14, 770 P.2d 313, 318 (1989). Rather, absent structural error, we usually will not reverse if the error was harmless. *Id.* Error is harmless if we can conclude beyond a reasonable doubt that it did not contribute to or affect the verdict. *State v. Bible*, 175 Ariz. 549, 588, 600, 858 P.2d 1152, 1191, 1203 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). In the murder trial, even had defense counsel been aware of the prior use of Meacham's testimony, the State would probably have been permitted, over defense objection, to elicit the same testimony from Meacham by disavowing the relevance of the testimony in the armed robbery trial and placing the reviewing court on notice so it could be considered in Defendant's appeal of that conviction. *See* Ariz. R. Evid. 401, 403.

Had defense counsel in the present case been aware of the prior inconsistent use of Meacham's testimony, however, he could have impeached Meacham with his prior testimony to raise doubts about whether the admission related to the murder. But after the prosecutor brought out Meacham's testimony in the murder trial, Defendant elicited the following from Meacham on cross-examination:

Q. Do you know for sure that [he was] talking about Mr. Jones [the victim]?

A. I thought [he was] talking about when [he] got busted before.

Q. So, in fact, you didn't think [he was] talking about Mr. Jones?

A. No, sir, I didn't.

R.T., Aug. 11, 1992, at 40. On re-direct, the prosecutor tried to rehabilitate the witness by showing that for all Meacham knew, Defendant might have been discussing events of the murder, but he got no more than the following:

Q. Okay. The conversation that you overheard, was it before or after all of this property came into the house?

A. I believe it was after.

Q. And you don't really know what the conversation that you heard pertains to, do you?

A. No, sir.

R.T., Aug. 11, 1992, at 41.

Thus, both the defense attorney and the prosecutor elicited testimony indicating Meacham either believed Defendant admitted some crime other than the charged murder or was not sure what Defendant was admitting. Any impeachment defense counsel would have obtained from having known of the testimony in the prior trial was effectively achieved. Accordingly, we conclude beyond a reasonable doubt that the prosecutor's misconduct did not affect the verdict. *See Bible,* 175 Ariz. at 588–90, 858 P.2d at 1191–93.

■■■ Because the prosecutor's misconduct did not violate any of Defendant's constitutional rights resulting in reversible error, and because judicial estoppel would not preclude Meacham's testimony in the murder trial, Defendant has no remedy with respect to his murder conviction on this ground. Rather, when error that is harmless results from prosecutorial misconduct, the proper remedy is to report the offender to the state bar for possible sanctions, which we have done. *Valdez,* 160 Ariz. at 14, 770 P.2d at 318.

■■■■ Defendant also objects to the State's use of his statement at the sentencing hearing to prove the murder was committed in an especially cruel, heinous, or depraved manner under A.R.S. § 13–703(F)(6). If Defendant's admission referred to an unrelated crime, it cannot be used to prove an aggravating factor for this crime. *See Bible,* 175 Ariz. at 604, 858 P.2d 1152 at 1207 (the special circumstances of cruelty, heinousness, or depravity apply to the defendant's actions during the offense). Although the trial judge

found beyond a reasonable doubt that the murder was especially cruel, heinous, and depraved, the special verdict indicates that the judge did not rely on the disputed statement to prove this aggravator. Under these circumstances, we find no error.

### D. Admission of late evidence

The State failed to timely disclose two pieces of evidence admitted by the trial judge: blood stains on a glove belonging to Defendant and fingerprints on a compact disk player case removed from Jones' car. Under Ariz. R.Crim. P. 15.1, the prosecutor should have disclosed this evidence, the names of the experts who examined it, and the reports or statements relating to it within ten days after Defendant's October 11, 1991 arraignment. The prosecutor did not disclose the fingerprint evidence until July 28, 1992 and the blood evidence until July 30, 1992, less than a week before trial began. Defendant moved to preclude this evidence on July 31. We note this was the only sanction Defendant requested; he did not ask for a continuance. Defendant contends the late disclosure and admission of this evidence deprived him of due process, requiring the verdict and sentence to be set aside.

▓▓▓▓▓ Rule 15.7 of the Arizona Rules of Criminal Procedure authorizes the trial court to sanction a party who does not timely disclose material relevant to the case. If a sanction is warranted, it should have a minimal effect on the evidence and merits of the case. *State v. Smith*, 140 Ariz. 355, 358–59, 681 P.2d 1374, 1377–78 (1984). Precluding evidence is rarely an appropriate sanction. *State v. Fisher*, 141 Ariz. 227, 246, 686 P.2d 750, 769, *cert. denied*, 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984); *but see State v. Killean*, 185 Ariz. 270, 915 P.2d 1225 (1996) (approving trial court's preclusion of corroborative documentation evidence when defense counsel failed to record existence of such evidence, willfully violating discovery rules). Denial of a sanction is generally not an abuse of discretion if the trial court be-

lieves the defendant will not be prejudiced. *Id.* Absent a showing of abuse by the trial court, we will not disturb the trial court's choice of sanction or its decision not to impose a sanction. *State v. Tucker*, 157 Ariz. 433, 439, 759 P.2d 579, 585 (1988).

▓▓▓▓ Before sanctioning the offering party, the court should consider (1) the importance of the evidence to the prosecutor's case, (2) surprise or prejudice to the defendant, (3) prosecutorial bad faith, and (4) other relevant circumstances. *Smith*, 140 Ariz. at 358–59, 681 P.2d at 1377–78.[16] Before admitting the evidence, the trial judge heard arguments from both sides and found no prejudice to Defendant from the late disclosure. After examining the four *Smith* factors, we agree with the trial judge's conclusion.

▓▓▓▓ First, the State conceded that the evidence was of little importance to its case. Neither the blood on the glove, which had not been analyzed for blood group type, nor the fingerprint found on the compact disk case removed from the Lincoln, provided a physical link to the murder. Next, because Defendant had been given timely notice of the identity of the State's latent print and blood experts, he should not have been surprised when they were called to testify about their findings. However, because neither the prosecutor nor the defense learned about the experts' findings until shortly before trial, Defendant could have been prejudiced had he been deprived of an opportunity to have his own experts study the evidence. When the trial judge asked Defendant how the late disclosure prejudiced him, he replied only that he was surprised by the experts' late reports. Thus, there is no indication of actual prejudice from the late disclosure. Further, Defendant offered no evidence of prosecutorial bad faith, and the trial judge found none. The prosecutor may be held accountable for the negligence of the State's blood expert, who waited until the last minute be-

---

**16.** These factors were enumerated in a case in which the defendant discovered an exculpatory witness during trial and moved to permit him to testify. Later cases have drawn on *Smith* when undisclosed witnesses have been called to testify.

This case is somewhat different because the State's experts and the nature of their involvement were known to Defendant's counsel well before trial. Nonetheless, we find the *Smith* factors helpful to our analysis here.

fore transmitting his nine-month-old report. *See State v. Castaneda,* 111 Ariz. 264, 266, 528 P.2d 608, 610 (1974) (prosecutor admonished for failing to use sufficient effort to keep apprised of the evidence). But because the defense's investigation of the evidence was not impaired by the State's delay, we find no prejudice to Defendant. In sum, the de minimis value of the evidence, Defendant's failure to show how its late disclosure hindered his defense, and the absence of prosecutorial misconduct on this issue lead us to conclude that the judge acted within her discretion in admitting the evidence without sanction.

Defendant further contends that the blood evidence lacked relevance and should not have been admitted. The State's blood expert testified only to the existence of human blood on the glove, not to its type or any other information that might have shown Defendant had physical contact with Jones. Arguing the glove served only to inflame the jury, Defendant contends the judge erred by not weighing its probative value against its potential for unfair prejudice, as required by Ariz. R. Evid. 403 and *State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983) ("the correct rule is that exhibits which may tend to inflame the jury must first be found relevant"). The record indicates that the blood spot was unremarkable and could only be seen on close inspection of the glove. We find that the glove was not inflammatory. Although the evidence had little probative value, we find no error in admitting it.

### SENTENCING ISSUES

When seeking the death penalty, the State must prove aggravating circumstances listed in A.R.S. § 13–703(F) beyond a reasonable doubt. *State v. Kiles,* 175 Ariz. 358, 369, 857 P.2d 1212, 1223 (1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). Defendant has the burden of proving any statutory or non-statutory mitigating circumstances by a preponderance of the evidence. *Id.* at 373, 857 P.2d at 1227; A.R.S. § 13–703(G). The death penalty is required if at least one aggravating factor is found and the mitigating circumstances are not sufficiently substantial to call for lenien-

cy. A.R.S. § 13–703(E). This court conducts an independent review of the aggravating and mitigating factors in all capital cases to determine whether the death penalty is warranted. *State v. Wood,* 180 Ariz. 53, 68, 881 P.2d 1158, 1173 (1994).

### A. Aggravating circumstances

#### 1. The cruel, heinous, or depraved aggravating factor

Defendant challenges the trial judge's finding that he committed the murder in an especially cruel, heinous, or depraved manner. A.R.S. § 13–703(F)(6). The judge determined that Jones was conscious until the second strangulation; she also found that ransacking Jones' house while he was bound, leaving him to agonize over his fate, sticking him several times with a hypodermic needle, and strangling him twice caused terror and horror in Jones' mind. The judge concluded that these events satisfied the meaning of cruelty under our case law. Special Verdict, Nov. 20, 1992, at 33–34. The judge also found that strangling rather than shooting the victim, leaving the victim's pants unzipped before laying him on his bed, attempting to inject an unidentified substance into him, and post-offense statements made to friends and roommates justifying and relishing the murder sufficiently demonstrated Defendant's depraved mental state and attitude, setting this case outside the usual first-degree murder. *Id.* at 34–35.

Defendant argues that the judge's findings lack sufficient support. First, Defendant argues that the facts of this case do not support a finding of cruelty because they do not show beyond a reasonable doubt that Jones suffered mental anguish and terror. Defendant cites a number of cases describing circumstances this court has found to be especially cruel, claiming this case does not come close. Second, Defendant argues that the facts do not satisfy the *Gretzler* factors to support a finding of heinous and depraved. *See State v. Gretzler,* 135 Ariz. 42, 52, 659 P.2d 1, 11, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We need not reach the heinous or depraved elements if we find cruelty beyond a reasonable doubt. *Kiles,* 175 Ariz. at 370, 857 P.2d at 1224

(finding beyond a reasonable doubt any one of the three elements of § 13–703(F)(6) is sufficient to constitute an aggravating circumstance).

We have held that:

A murder is committed in an especially cruel manner if the perpetrator inflicts mental anguish or physical pain upon the victim before the victim's death. Mental anguish includes a victim's uncertainty about [his] ultimate fate.

*Id.* at 371, 857 P.2d at 1213 (internal citations omitted). A finding of cruelty requires conclusive evidence that the victim was conscious and suffered mental or physical pain at the time of the offense. *Bible,* 175 Ariz. at 604, 858 P.2d at 1207.

Barker testified that Jones did not struggle or appear to be breathing when Defendant strangled him the second time. Barker heard him gagging the first time he was strangled. The medical examiner testified that Jones could have been conscious while being strangled the second time, but he could offer no evidence of Jones' actual consciousness. Other evidence, however, convincingly shows that Jones suffered extreme mental and physical pain. He was conscious when the two men with a gun confronted him in his home, bound his hands behind his back, took him upstairs, asked him whether he wanted to be left tied or put to sleep, placed him face down on his bed, and pushed his head down while pulling on the tie to strangle him. He was conscious while Defendant stabbed his arms several times to inject a mystery substance. Defendant believed Jones was conscious after the injections because he heard Jones snoring, pretending to be asleep, even though Defendant had injected no sleeping medication. Jones was therefore conscious when he was strangled the first time. These events certainly caused Jones mental anguish about his fate, and the needle punctures and first strangulation caused him physical suffering. We find beyond a reasonable doubt that Defendant inflicted mental anguish and physical pain on the victim and that the murder was therefore committed in an espe-

cially cruel manner. Thus, the (F)(6) aggravating factor is satisfied, and we need not consider whether the murder was committed in an especially heinous or depraved manner.

### 2. Other aggravators

We also find ample support for the other aggravators. It is undisputed that Defendant was convicted of armed robbery, involving the threat of violence, while on parole, making him eligible for a life sentence. That conviction now makes him eligible for the death penalty. A.R.S. § 13–703(F)(1) and (2).

Defendant also does not dispute that the murder was prompted by a desire for and an expectation of pecuniary gain. Killing for financial gain is an aggravating factor for imposing the death sentence. A.R.S. § 13–703(F)(5); *State v. White,* 168 Ariz. 500, 510–11, 815 P.2d 869, 879–80 (1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). A pecuniary motive took Defendant to the victim's house and was the impetus for his other conduct during the ensuing robbery and killing. This qualifies him for the death penalty. *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

### B. Mitigating circumstances

We independently weigh the mitigating evidence against the aggravating circumstances to determine whether leniency is called for. *State v. Barreras,* 181 Ariz. 516, 520–21, 892 P.2d 852, 856–57 (1995).

### 1. Defendant's abusive family background

The trial judge considered evidence of Defendant's abusive family background and did not find mitigating value in it. Citing a line of Supreme Court cases [17] requiring courts to consider family history for independent mitigating weight, Defendant calls the judge's finding unconstitutional. Although the judge rejected the evidence as a mitigating factor because he failed to establish a nexus between his family background and his crime,

---

17. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Defendant argues that the judge violated the law.

 Defendant misconstrues the Supreme Court cases culminating in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). They hold only that "a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as a basis for a sentence less than death." *Id.* at 318, 109 S.Ct. at 2946. Having considered family background during the penalty phase, the sentencer must give the evidence such weight that the sentence reflects a "reasoned moral response" to the evidence. *Id.* at 319, 109 S.Ct. at 2947. The sentencer therefore must consider the defendant's upbringing if proffered but is not required to give it significant mitigating weight. How much weight should be given proffered mitigating factors is a matter within the sound discretion of the sentencing judge. *State v. Atwood*, 171 Ariz. 576, 648, 832 P.2d 593, 665 (1992).

 We have held that a difficult family background is not always entitled to great weight as a mitigating circumstance. *State v. Wallace*, 160 Ariz. 424, 426–27, 773 P.2d 983, 985–86 (1989) ("A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control."), *cert. denied*, 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). We have since reaffirmed that family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct. *White*, 168 Ariz. at 512–13, 815 P.2d at 881–82.

 Defendant has failed to connect his family background to his criminal conduct. Defendant's sisters testified at the sentencing hearing that he was a small child with dyslexia and a bed-wetting problem and that he was physically and mentally abused by his overweight and diabetic mother. One sister related that his mother forced him to kneel in a box of rice when he complained that his leg hurt after falling from a wagon, and that

she gagged him with a sock and bound his hands in the back of the car while on a family trip. These events, however, occurred when Defendant was young, years before he robbed and murdered at the age of 27. They do not prove a loss of impulse control or explain what caused him to kill. The trial judge considered this background and gave it little or no mitigating value. We do not disagree.

### 2. Other mitigating circumstances

 The trial judge considered all the statutory mitigating factors under § 13–703(G) and gave them no weight. She found some mitigation in Defendant's drug use because it may have impaired his ability to conform his conduct to the requirements of the law. She found Barker's disproportionate sentence in relation to Defendant's a mitigating circumstance and gave it significant weight. Nonetheless, she concluded that the mitigating evidence was not sufficiently substantial to require leniency, even if any combination of only two aggravating factors is affirmed by this court.

We have examined the record for mitigating circumstances and find the rather sparse evidence insufficient to overcome the weight of the aggravating circumstances. We therefore affirm the death sentence.

### C. Summary issues

To preserve issues, Defendant also raised the following arguments, which we summarily reject. *See Atwood*, 171 Ariz. at 645 n. 21, 832 P.2d at 662 n. 21.

### 1. The equal protection clause requires sentencing by a jury

This claim has no logical basis and has been rejected in *State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116, *cert. denied*, 510 U.S. 927, 114 S.Ct. 334, 126 L.Ed.2d 279 (1993).

### 2. Arizona's death penalty statute insufficiently channels the sentencer's discretion

This claim has been rejected in *West*, 176 Ariz. at 454, 862 P.2d at 214, and *State v.*

*Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

### 3. The death penalty violates Defendant's Eighth Amendment right against cruel and unusual punishment

This claim has been rejected by the United States Supreme Court in *Walton v. Arizona,* 497 U.S. 639, 655–56, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990), and we reject it now.

### CONCLUSION

As required by A.R.S. § 13–4035, we have searched the record for fundamental error and have found none.[18] Of the issues raised by Defendant on appeal, none requires reversal. We therefore affirm Defendant's first-degree murder conviction and the death sentence.

ZLAKET, V.C.J., MOELLER and MARTONE, JJ., and CORCORAN, J. (Retired), concur.

---

**18.** The convictions in this capital case were appealed, briefed, and argued before the effective date of the repeal of A.R.S. § 13–4035. *See* 1995 Laws, ch. 198, § 1.